754 A.2d 1264

COMMONWEALTH of Pennsylvania, Appellee,

v.

Rasheed SIMPSON, Appellant.

Supreme Court of Pennsylvania.

Argued Feb. 1, 2000.

Decided July 20, 2000.

Reargument Denied Sept. 18, 2000.

Bernard L. Siegel, Philadelphia, for Rasheed Simpson.

Catherine Marshall and Anthony V. Pomeranz, Philadelphia, for Com.

Robert A. Graci, Harrisburg, for Office of Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

NEWMAN, Justice.

Rasheed Simpson (Appellant) has filed this direct appeal[1] from the judgment of sentence of the Court of Common Pleas

---

1. This Court has jurisdiction of a direct appeal from a judgment of sentence in cases where the death penalty has been imposed. 42 Pa.C.S.A. § 9711(h).

of Philadelphia County (trial court) imposing a sentence of death following his conviction for first-degree murder.[2] After a thorough review of the record in light of the claims raised by Appellant, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

On December 8, 1993, at about 9:00 p.m., Appellant, along with three co-conspirators, abducted Andrew Haynes (the victim) from somewhere in the vicinity of 18th and Tioga Streets in North Philadelphia. The kidnappers threw the victim into a waiting van and took him to the apartment of Rasheema Washington (Washington), who was a close friend of Malik Bowers (Bowers), one of Appellant's co-conspirators.

Washington, who expected nothing other than that Bowers would soon present himself at her apartment, was stunned at the group's unannounced arrival. She watched the kidnappers throw the victim onto the floor of her apartment, beat him and demand money. In addition, she noticed that the group had tied the victim's hands behind his back, bound his legs, gagged him and pulled a hat over his face to prevent him from seeing them or his surroundings. Washington further observed Appellant and another member of the group, Allistar Durrante (Durrante), enter her bedroom and use the telephone there. After about a half-hour, and at Washington's insistence, the kidnappers left Washington's residence, bringing with them the still bound and gagged victim.

Not long after the victim's disappearance, Appellant placed a telephone call to the victim's apartment, which the victim's friend, Aloysius Hall (Hall), received. The caller identified

2. Section 2502 of the Crimes Code, 18 Pa.C.S.A. § 2502, defines murder of the first degree as:

(a) **Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

. . .

(d) **Definitions.**—As used in this section the following words and phrases shall have the meanings given to them in this subsection:

. . .

**"Intentional killing."** Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing.

himself as the man who had robbed Hall several weeks prior to that evening. Additionally, the caller responded affirmatively when Hall asked him if he was "Rasheed." The caller, whom Hall now recognized as Appellant, informed Hall that he and his co-conspirators had the victim and that they intended to kill him if they were not paid $20,000.00 within fifteen minutes.

Following this initial conversation, Hall telephoned the house of the victim's mother and described the details of the ransom call to the victim's brother, Selvan Haynes (Haynes). Alarmed, Haynes immediately went to his brother's apartment. Subsequent to arriving at the victim's apartment, Haynes received a second telephone call placed by the kidnappers about fifteen minutes after the initial call. Again, the group declared that they had the victim and that they intended to kill him if they did not receive $20,000.00 in ransom. Haynes attempted to reason with the caller, pleading that obtaining such a large sum of money in such a short time would be impossible for him. The caller responded by exclaiming that the group was not joking, after which he abruptly hung up the telephone.

Before returning to his mother's house, Haynes arranged to have the incoming telephone calls to the victim's apartment forwarded to his mother's house. Shortly after that, Haynes received a forwarded call at his mother's residence, the third placed by the group. The caller repeated the group's demands. In response, Haynes offered the kidnappers $3,000.00 in cash and his two vehicles; the kidnappers rejected this offer. The kidnappers called again, and in this instance, they allowed Haynes to speak with the victim. The victim begged his brother to do something to save his life. The group called one final time and repeated their demands; and following that, neither Haynes nor Hall had any further contact with the group.

At about midnight this same evening, officers with the Philadelphia Police Department responded to a report of a dead body found in a vacant lot at 18 th and Somerset Streets, a location in close proximity to both Washington's residence

and the site of the kidnapping. At that location, they discovered the victim's dead body. His hands were tied behind his back and a hat partially covered his face. The victim had suffered four bullet wounds to the back of his head.

On December 16, 1993, a week after police discovered the victim, Appellant, Bowers and Washington, along with two others, traveled to a Montgomery County movie theater. While the group was in the movie theater, a police officer patrolling the parking lot noticed that the vehicle in which the group had been riding did not have a license plate. In searching the car's dashboard for a vehicle identification number, the officer noticed a gun jutting out from under the front seat of the car. The officer called for backup and three additional officers joined him in his surveillance of the vehicle. When Appellant, Bowers, Washington and the others returned and entered the automobile, the officers ordered the group from the car. Ultimately, the Montgomery County authorities arrested Bowers and seized the gun.[3] Appellant and the others were permitted to leave.

In an interview with Philadelphia police in June of 1996, Washington divulged the details surrounding the kidnapper's arrival at her apartment and the group's actions during this time period. Based in large part on Washington's interview, coupled with the earlier statements given to police by Haynes and Hall after the discovery of the victim's body, the police arrested Appellant in July of 1996 for his participation in the crime. The authorities charged Appellant with, *inter alia,*

3. Because of the condition of the bullet fragments taken from the victim's head, the Commonwealth's firearms expert was unable to determine conclusively whether the gun seized by the Montgomery County authorities was the weapon that produced the four wounds to the victim's head. However, the trial court allowed the Commonwealth to present the weapon, a nine-millimeter, Chinese-manufactured lugar, as evidence at trial. *See Commonwealth v. Spotz,* 552 Pa. 499, 519–21, 716 A.2d 580, 590 (1998) ("The Commonwealth need not establish that a particular weapon was actually used in the commission of a crime in order for it to be introduced at trial. Rather, the Commonwealth needs to show sufficient circumstances to justify an inference by the finder of fact that the particular weapon was likely to have been used in the commission of the crime charged.") (citation omitted).

murder of the first degree, kidnapping,[4] robbery,[5] conspiracy[6] and possessing an instrument of crime.[7]

On December 17, 1997, a jury found Appellant guilty of first-degree murder, robbery, kidnapping, conspiracy and possessing an instrument of crime. At the penalty stage proceedings on the first-degree murder charge, the Commonwealth presented evidence in support of three aggravating circumstances: (1) that Appellant was holding the victim for ransom or reward at the time of the murder;[8] (2) that Appellant had a significant history of felony convictions involving the use or threat of violence to the person;[9] and (3) that Appellant had been convicted of another murder committed either before or after the offense at issue.[10] In defense, Appellant offered the mitigating factors of: (1) his age,[11] (2) his character and (3) the circumstances of his offense.[12] The jury found all three proffered aggravators and considered Appellant's age as a mitigating factor. In the end, the jury concluded that the aggravators outweighed the mitigating factor and, on December 22, 1997, sentenced Appellant to death. This direct appeal followed.[13]

**4.** 18 Pa.C.S.A. § 2901.

**5.** 18 Pa.C.S.A. § 3701.

**6.** 18 Pa.C.S.A. § 903(a).

**7.** 18 Pa.C.S.A. § 907(a).

**8.** 42 Pa.C.S.A. § 9711(d)(3).

**9.** 42 Pa.C.S.A. § 9711(d)(9).

**10.** 42 Pa.C.S.A. § 9711(d)(11).

**11.** 42 Pa.C.S.A. § 9711(e)(4).

**12.** 42 Pa.C.S.A. § 9711(e)(8).

**13.** The police also arrested Bowers at around the same time they arrested Appellant. The police charged Bowers with identical crimes as Appellant and the two were tried together. The jury found Bowers guilty of the same charges, and he received a sentence of life imprisonment for his first-degree murder conviction. Additionally, the authorities tried Durrante, the third known conspirator, approximately two years before trying Appellant and Bowers. Durrante was found guilty of second-degree murder, robbery, kidnapping, conspiracy and related charges for his part in the crime. The police were never able to identify the fourth conspirator.

On appeal to this Court, Appellant raises six issues for our review. First, Appellant argues that the trial court erred by failing to grant a mistrial after the prosecutor elicited a witness' subjective feelings concerning her belief that Appellant was a violent person. Second, Appellant contends that the trial court erred in its jury instruction regarding the need for an accomplice or co-conspirator to have the individual specific intent to kill to support a conviction of first-degree murder. Third, Appellant asserts that the trial court erred by not granting a mistrial at the penalty stage when the prosecutor asked a defense witness about the possibility that Appellant could be pardoned. Fourth, Appellant believes that the trial court erred in not granting a mistrial due to the prosecutor's purportedly unfair reference to the murder as an execution in his closing argument at the guilt stage of trial. Finally, Appellant's last two arguments are attacks on the sufficiency and on the weight of the evidence. Because we find that Appellant is not entitled to relief on any of his claims of error, we must affirm the sentence of death.

## II. DISCUSSION

### A. Sufficiency and Weight of the Evidence

 Appellant asserts that the evidence was insufficient to support a guilty verdict on the charge of first-degree murder. Even in the absence of Appellant's contention here, this Court must review the sufficiency of the evidence to sustain a conviction for first-degree murder in every case in which the death penalty has been imposed. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). When reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible from the evidence, viewed in the light most favorable to the Commonwealth as the verdict winner, are sufficient to establish all the elements of the offense beyond a reasonable doubt. *Commonwealth v. Hall*, 549 Pa. 269, 279–80, 701 A.2d 190, 195 (1997), *cert. denied*, 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998).

 To sustain a conviction for first-degree murder, the Commonwealth must prove that the defendant acted with the specific intent to kill, that a human being was unlawfully killed, that the accused did the killing and that the killing was done with deliberation. *Id.* at 196. It is the specific intent to kill which distinguishes murder in the first degree from lesser grades of murder. *Commonwealth v. Smith*, 548 Pa. 65, 68–70, 694 A.2d 1086, 1088 (1997), *cert. denied*, 525 U.S. 847, 119 S.Ct. 118, 142 L.Ed.2d 95 (1998). This Court has held repeatedly that the use of a deadly weapon on a vital part of a human body is sufficient to establish the specific intent to kill. *Commonwealth v. Walker*, 540 Pa. 80, 89–91, 656 A.2d 90, 95 (Pa.), *cert. denied*, 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995). Additionally, the Commonwealth can prove the specific intent to kill from circumstantial evidence. *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444 (1998). Furthermore, each member of a conspiracy to commit murder can be convicted of capital murder, regardless of which of the conspirators inflicted the fatal wound. *Commonwealth v. Jones*, 542 Pa. 464, 482–84, 668 A.2d 491, 500 (1995); *Commonwealth v. Joseph*, 451 Pa. 440, 449–50, 304 A.2d 163, 168 (1973).

 After an exhaustive review of the record in the instant matter, we can conclude without hesitation that the evidence was sufficient to sustain the conviction for first-degree murder. The record establishes that Appellant and three other men abducted the victim and brought him to Washington's apartment. While there, Washington observed the group beat the victim and demand money. Also, as evidenced by the testimony of the victim's brother, Haynes, and the victim's friend, Hall, the group placed telephone calls threatening to kill the victim if they did not receive $20,000.00. In at least one of these calls, Appellant acknowledged that he was the person whom Hall knew as Rasheed. Sometime later that evening, the victim's dead body was discovered with four bullet wounds to the back of the head in a vacant lot close in proximity to both the site of the abduction and Washington's apartment. Moreover, about a week after the murder Appellant was with Bowers, one of his co-conspirators, when Mont-

gomery County authorities arrested Bowers and confiscated a gun.

Viewed in the light most favorable to the Commonwealth, the prosecution presented evidence to the jury to support a finding that Appellant willingly and consciously participated in the intentional killing of the victim. The evidence demonstrated that the Appellant took part in a conspiracy to abduct the victim for ransom. The evidence further confirmed the Commonwealth's theory that the group followed through on their threat to kill the victim when the victim's brother failed to surrender the requested amount of money. While the police were unable to deduce exactly which of the kidnappers ultimately killed the victim, the prosecution still managed to produce evidence to support a finding that Appellant, on his own, whether he actually pulled the trigger or not, maintained the requisite specific intent to take the victim's life. This clearly satisfies the statutory elements of first-degree murder, and the evidence is therefore sufficient to sustain the conviction.

Appellant also argues that even if the evidence was sufficient to support a finding of first-degree murder, the verdict was against the weight of the evidence. This Court has opined on numerous occasions that the "decision to grant or deny a motion for a new trial on the ground that the verdict is against the weight of the evidence is committed to the sound discretion of the trial court." *Commonwealth v. Rucci,* 543 Pa. 261, 276–78, 670 A.2d 1129, 1137 (1996), *cert. denied,* 520 U.S. 1121, 117 S.Ct. 1257, 137 L.Ed.2d 337 (1997). This Court will not disturb a trial court's denial of a motion for a new trial based on a claim that the verdict was against the weight of the evidence unless the trial court abused its discretion in denying such a motion. *Id.* In essence, a new trial can only be granted on a claim that the verdict was against the weight of the evidence in the extraordinary situation where "the jury's verdict is so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Brown,* 711 A.2d at 451.

Applying the standard to this case, we conclude that the verdict was not against the weight of the evidence because the outcome of the trial below satisfies our society's common notions of fairness. Appellant is entitled to no relief on this claim, as the verdict was not against the weight of the evidence.

### B. Alleged Improper Prejudicial Statement of Appellant's Propensity for Violence

Appellant next asserts that the trial court erred in denying his motion for a mistrial, which motion Appellant premised on his belief that the prosecutor intentionally elicited improper prejudicial testimony regarding Appellant's supposed propensity for violence. In support of this argument, Appellant directs the Court's attention to a pretrial hearing where the parties clarified the parameters of the questioning that the prosecutor could properly pursue with respect to Washington, the Commonwealth's key witness. Specifically, defense counsel requested that the Commonwealth be prohibited from asking Washington questions that would elicit responses related to two segments of her statement to the police in which she relayed her belief that Appellant had a tendency toward violent behavior.[14] The trial judge cautioned the prosecutor that certain statements, if brought out by the prosecutor prior to defense counsel broaching the issue of Washington's failure to go immediately to the police, would result in a mistrial. (N.T. 12/10/97, p. 16.) The prosecutor agreed not to elicit any testimony from Washington with respect to these aspects of her police statement, unless it became appropriate.

14. The first segment of her statement to police involved Washington's response to a question posed by detectives who asked her how she knew that the person who was in her apartment the night of the killing was the same person reported dead in a television news account the next day. To this question, Washington responded: "I just took for granted that it was him knowing how Rasheed Simpson is." (Notes of Testimony (N.T.) 12/10/97, pp. 13–14.) The second part of Washington's statement at issue dealt with Washington's response to an investigator's question as to why she never told anyone about the kidnappers' activities that evening in her apartment. Washington stated that she never discussed the incident with anyone because she was worried about what would happen to her because she knew that Appellant was "trigger happy." (N.T. 12/10/97, p. 15.)

At trial, the following exchange took place during the Commonwealth's redirect examination of Washington:

Q. [By the Commonwealth]: [Defense counsel] asked you in substance the only reason that you ever came forward was to save yourself because you may be charged with murder and you didn't care about anybody but yourself. Do you remember that question?

A. [By Washington]: Yes.

Q.: And you in fact did not come forward; is that correct?

A.: Correct.

. . .

Q. : What was the reason that you didn't come in and tell the police about this incident that occurred at least in your apartment?

*Defense counsel: That's objected to.*

*The Court: No. That's a good question. And it's not leading. In other words, this happened in your apartment. You saw it. You were horrified by it. And you remained friends with Malik. Why didn't you tell the police about it at some time?*

A. [By Washington]: One, I was scared. Two is that me and Malik was friends so long I didn't really want to lose his friendship.

*The Court: Okay.*

Q. [By the Commonwealth]: Were you afraid of—what were you afraid of?

A. [By Washington]: Really me being involved with it being as though they bought [sic] it to my apartment and I had nothing to do with it.

*The Court: In other words, the reason then you didn't tell the police is because you had been friends with Malik so long and you also were concerned that you might be involved?*

A. [By Washington]: Correct.

*The Court: Okay.*

Q. [By the Commonwealth]: Were you afraid that the police were going to charge you.

A. [By Washington]: Yes.

Q.: Were there any—was there anything else that you were afraid of?

A.: Yes, that something would happen to me if I told.

Q.: What do you mean that something would happen to you if you told?

*Defense Counsel: That's objected to.*

*The Court: Are you saying that your friend Malik, who you continued to friends with, you were afraid would hurt you, is that—*

A. [By Washington]: No, I wasn't afraid of Malik at all.

*The Court: Okay. Were you afraid that Rasheed would hurt you?*

A. [By Washington]: Yes.

*Defense Counsel: I object, your Honor.*

*The Court: Overruled. Overruled. You may proceed. What occurred to make you think that?*

*Defense Counsel: Objection to that, your Honor.*

*The Court: No, did you have any—did Rasheed say anything to you about this case, did you say anything to him?*

A. [By Washington]: No. He didn't say anything to me at all.

*The Court: Well then what made you be afraid?*

A. [By Washington]: **Just know how he was.**

*The Court: Okay. I'm—*

*Defense Counsel: I object, your Honor.*

*The Court: I'm going to strike that answer. There is no basis for that feeling and I'm going to strike the answer. Your objection is sustained.*

(N.T. 12/12/97, pp. 102–07 (emphasis added).) Appellant's counsel moved for a mistrial based on the above discourse, arguing that the prosecutor's line of questioning, which was

augmented by the trial court's interjections, elicited testimony that the trial court had ordered excluded at the pretrial hearing. The trial court denied Appellant's motion believing that any prejudice that the Appellant had suffered because of Washington's statement was quickly rectified by a cautionary instruction given by the trial court.

Before this Court, Appellant argues that the trial court abused its discretion by failing to grant his motion for a mistrial. In support of this position, Appellant asserts that the prosecutor intentionally pursued a line of questioning, to which the trial court eventually joined, knowing that these questions would improperly extract from Washington her belief that Appellant was a violent person. Appellant believes that Washington's testimony prejudicially imparted to the jury her impression that Appellant had a history of violence, and that the parties and the trial court agreed at the pretrial conference that if the prosecutor elicited this testimony, the trial court would order a mistrial. Furthermore, Appellant takes exception to the trial court's rationale that a prompt cautionary instruction cured the problem on two grounds. First, Appellant claims that the trial court never gave any such instruction. Second, Appellant believes that even if the trial court did give a cautionary instruction, the implication that Appellant was prone to violence was too great to be mended by the instruction of the court.

The Commonwealth responds by asserting that the trial court did not abuse its discretion in denying Appellant's motion for a mistrial. The Commonwealth believes that Washington's assertion that she knew how defendant was could not have deprived the jury of its ability to reach a fair verdict because this statement was too vague to have influenced the jury. In addition, the Commonwealth counters that the trial court promptly instructed the jury that they were to disregard Washington's statement, and further that this instruction cured any purported prejudice.

The trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury, and as

such, the grant or denial of a mistrial will not be overturned absent an abuse of discretion. *Commonwealth v. Robinson,* 543 Pa. 190, 200–01, 670 A.2d 616, 621 (1995). A mistrial may be granted only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. *Commonwealth v. Spotz,* 552 Pa. 499, 523–25, 716 A.2d 580, 592 (1998); *Robinson,* 670 A.2d at 621. Likewise, a mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice. *Spotz,* 716 A.2d at 592–93; *Commonwealth v. Lawson,* 519 Pa. 175, 185–87, 546 A.2d 589, 594 (1988).

■ In the present case, we find that the trial court did not abuse its discretion in denying Appellant's motion for a mistrial. In response to the trial court's inquiry regarding the basis of her fear of Appellant, Washington proffered: "Just know how he was" in reference to Appellant. This statement made by Washington, regardless of the admonition of the trial court at the pretrial hearing, was unlikely to prevent the jury from fairly examining the entirety of the evidence and rendering a true verdict.

Furthermore, contrary to Appellant's argument, the trial court promptly and thoroughly cautioned the jury to disregard Washington's statement.[15] The trial court distinctly announced to the jury that they could not consider Washington's

15. The Court offered the following cautionary instruction:

> Let me tell the jury, with respect to the witness' testimony concerning the reason she did not go to the police, she indicated one of the reasons was her fear of involvement. One of the reasons was her friendship with Malik. She also indicated pursuant to a question that I asked her that one of the reasons was fear. Now, where there is a particular—where there's evidence where someone intimidates a witness, that's something you should hear. But where there is no such evidence, then you can't hear it and it's not relevant and that's why I changed that ruling and struck that. *There's no evidence in this case that any of these defendants in any way threatened this witness. That being the case, you cannot consider the reason for her failure to go to the police to have anything to do with fear. And that should be stricken and not considered by you.*

(N.T. 12/12/97, pp. 112–13 (emphasis added).)

supposed fear of Appellant for any purpose. It is well settled that juries are presumed to follow the instructions of a trial court to disregard inadmissible evidence. *Commonwealth v. Miller*, 541 Pa. 531, 551, 664 A.2d 1310, 1319 n. 15 (1995), *cert. denied*, 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996). Even if the jury could have deduced from Washington's vague statement that she feared for her safety based on her knowledge of Appellant as a violent person, the statement was quickly discounted by the trial court as unsupported by the record, and the trial court instructed the jury not to consider the statement. Thus, any possible prejudice was cured.

Appellant relies on *Commonwealth v. Satzberg*, 358 Pa.Super. 39, 516 A.2d 758 (1986), to support his position that Washington's statement was far too prejudicial to be negated by a curative instruction. In *Satzberg*, the defendant was charged with theft by unlawful taking, receiving stolen property and related offenses. The assistant district attorney trying the case stated in his opening remarks that the defendant "did nothing for two and a half years except to do drugs." *Id.* at 762. Defense counsel objected to the prosecutor's statement and moved for a mistrial. The trial court overruled the objection and permitted the prosecutor's reference to the defendant's alleged drug use. This was because of the prosecutor's representations that the evidence would establish that the defendant's drug use served as the motive for the charged crimes. At the end of trial, however, the trial judge found that there was insufficient evidence to establish that drug use served as the motive for the defendant's actions. Thus, in his closing charge, the trial court cautioned the jury to ignore any statements or testimony regarding the defendant's purported drug use, including the prosecutor's statement in his opening remarks.

The jury convicted the defendant in *Satzberg*. He appealed to the Superior Court arguing that the prosecutor's statement regarding alleged drug use unduly prejudiced him before the jury and should have resulted in a mistrial. The Superior Court agreed and concluded that "the prejudice to the [defen-

dant] was simply too great to be negated by a curative instruction." *Id.* at 763.

We are not persuaded by Appellant's argument, which relies on the rationale set forth in *Satzberg,* that there was incurable prejudice to Appellant in this case. The nature of the challenged statement in *Satzberg,* as compared with the one challenged here, is completely different. In *Satzberg,* the prosecutor made a direct and unambiguous comment in his opening statement that the defendant had a history of drug use. This is unlike the vague statement made by the Commonwealth's witness here. More important, the jury in *Satzberg* was permitted to contemplate the prosecutor's statement during the entire trial, as the statement was made in opening argument and the trial judge only cautioned the jury at the end of the trial after it became apparent that the evidence did not support drug use as a motive. The Superior Court believed that this tainted the entire trial to a point where a cautionary instruction in the closing charge would be ineffectual. By contrast, the trial judge in the present matter immediately discounted the witness' statement and instructed the jury to disregard the statement because there was no evidence in the record to support Washington's purported fear of Appellant. In summary, we find *Satzberg* readily distinguishable from this case and we believe that the present trial judge acted competently in issuing a prompt and thorough instruction.

Accordingly, we find that the trial court did not abuse its discretion in denying Appellant's motion for a mistrial based on Washington's allegedly prejudicial statement. The witness' statement vaguely alluded to her belief that the Appellant had a propensity for violence, but was unlikely to hinder the jury's assessment of the evidence. Moreover, the trial court quickly instructed the jury to disregard the statement because the record did not support it. As such, Appellant's claim here fails.

## C. Capital Murder Jury Instruction

Appellant next asserts that the trial court erred by not instructing the jury that it could only convict Appellant of

first-degree murder as an accomplice or conspirator if he personally harbored the specific intent to kill the victim. Appellant argues that the trial court instructed the jury on accomplice and conspiratorial liability, yet failed to highlight in its instructions that a defendant cannot be held culpable for first-degree murder as an accomplice or conspirator unless the defendant personally harbors his or her own specific intent to kill. According to Appellant, the deficient jury instruction allowed the jury to convict him for first-degree murder without a finding that he personally possessed the specific intent to kill.

In *Commonwealth v. Wayne*, 553 Pa. 614, 720 A.2d 456 (1998), this Court examined the issue of whether a trial court properly instructed the jury as to conspiratorial liability in a case where the defendant also faced charges of first-degree murder. In addressing that matter, we noted that under general principles of conspiratorial liability a defendant can be held criminally responsible for the entirety of the acts of his co-conspirators performed in furtherance of the conspiracy, regardless of whether the defendant intended that certain acts be undertaken. Stated differently, a defendant can be held accountable for the actions of his or her co-conspirators although the defendant did not specifically intend for the co-conspirators to perform these acts. This Court went on to contrast this rule of law with the specific intent requirement of first-degree murder. We stressed that the specific intent to kill was the particularly heinous element that made first-degree murder the only crime punishable by the imposition of death. We recognized in *Wayne* that there is a patent incongruity between conspiratorial liability, where a defendant can be held criminally responsible for acts he or she did not specifically intend to take place, and first-degree murder, where a defendant must maintain the specific intent to kill.

In reconciling the conflict between conspiratorial liability and the specific intent requirement of first-degree murder presented in *Wayne*, this Court concluded that a pure application of the principles of conspiratorial liability to the crime of first-degree murder would improperly relieve the Commonwealth of its burden of proving that the defendant personally

maintained the specific intent to kill. Relying on the reasoning of our decisions in *Commonwealth v. Huffman*, 536 Pa. 196, 638 A.2d 961 (1994) and *Commonwealth v. Bachert*, 499 Pa. 398, 453 A.2d 931 (1982), this Court concluded that, because of the seriousness of the penalty involved, the specific intent element of first-degree murder should be elevated above principles of conspiratorial liability. Consequently, we unambiguously stated that, "[t]o be guilty of first degree murder, each co-conspirator must individually be found to possess the mental state necessary to establish first degree murder—*the specific intent to kill.*" *Wayne*, 720 A.2d at 464. Ultimately, we held that the jury instruction in *Wayne* was deficient because it allowed the defendant's conviction for first-degree murder absent a finding that he maintained the specific intent to kill.[16]

In the present case, the trial court gave the following jury instructions regarding first-degree murder:

Murder of the first degree is a criminal homicide committed with a specific intent to kill. *Now, remember, each defendant is on trial individually and the evidence against each with respect to all charges, including first degree murder, must be considered separately.* Again, murder of the first degree is a criminal homicide committed with a specific intent to kill. *Therefore, in order to [find] the defendant guilty of murder of the first-degree, you must find that the defendant had the specific intent to kill and that the killing was willful deliberate and premeditated.*

. . .

*Murder of the first degree requires that the particular defendant have a specific intent to kill.* It is an unlawful, willful deliberate and premeditated killing with malice.

**16.** Despite our finding in *Wayne* that the jury instruction was deficient, we still upheld the defendant's conviction for first-degree murder because in that case the conspiracy was one to commit murder. Because "[a] conspiracy to kill presupposes the deliberate premeditated shared specific intent to commit murder," the faulty jury instruction did not alleviate the Commonwealth's burden to prove specific intent to kill, and the defendant did not suffer any prejudice. *Wayne*, 720 A.2d at 465.

(N.T. 12/16/97, pp. 14, 22 (emphasis added).) [17] After the trial court gave its instructions as to first-degree murder, the trial court then charged the jury pertaining to accomplice and conspiratorial liability.[18]

When examined as a whole, the jury instructions given in the present case coherently and unambiguously informed the jury that the Commonwealth needed to prove beyond a reasonable doubt that Appellant maintained the individual specific intent to kill the victim to support a finding of first-degree murder. Initially, the trial court instructed the jury that "in order to [find] the defendant guilty of murder of the first-degree, *you must find that the defendant had the*

**17.** Additionally, in response to a jury request for a clarification of the various degrees of murder, the trial court stated:

Now, murder of the first degree is a criminal homicide committed with a specific intent to kill. *Now, remember, each defendant is on trial individually and the evidence against each with respect to all charges including first degree murder must be considered separately. [I]n order to find the defendants guilty of murder in the first degree, you must find that the particular defendant had the specific intent to kill.* (N.T. 12/16/97, pp. 79–81 (emphasis added).)

**18.** The trial court instructed the jury on accomplice and conspiratorial liability as follows:

A defendant is guilty of a crime if he is an accomplice of another person or persons who commits these crimes ... He is an accomplice if with the intent of promotion or facilitating commission of the crime, he solicits, commands, encourages or requests the other person to commit it, or aids, agrees to aid or attempts to aid the other person or persons in planning or committing the crimes.

...

You may find the defendant guilty of the crimes charged as a conspirator if you're satisfied beyond a reasonable doubt first, that the defendant agreed with another person or persons that they or one of them would commit these crimes, or that the defendant would aid another person or persons in committing these crimes; and second, that the defendant so agreed with the intent of promoting or facilitating the commission of these crimes; and third that while the agreement remained in effect, the crimes were committed by the defendant or that other person or persons; and fourth, that the crimes were committed by the defendant or that other person or persons, or in this case it would be by that other person or persons, if you are finding guilt as a coconspirator, and that they were committed by that other person or persons in furtherance of the Defendant's and his—that the other person's common design. (N.T. 12/16/97, pp. 33–36.)

*specific intent to kill* and that the killing was willful deliberate and premeditated." (N.T. 12/16/97, p. 14. (emphasis added).) It was against the backdrop of this clear charge to the jury regarding the requisite mental state for first-degree murder that the court further instructed the jury regarding the principles of accomplice and conspiratorial liability. In reviewing the instructions of the trial court as to accomplice and conspiratorial liability, nothing in the language of those instructions undermined the clear charge regarding the specific intent element of first-degree murder. Additionally, when the jury requested that the trial court elucidate the definitions of the various degrees of murder, the trial court reiterated to the jury that "in order to find the defendants guilty of murder in the first degree, you must find that *the particular defendant had the specific intent to kill.*" (N.T. 12/16/97, p. 80 (emphasis added).) Although Appellant premises his argument on the contrary, the trial court is not required to deliver its instructions regarding first-degree murder and those regarding accomplice and conspiratorial liability in a prescribed manner. *Commonwealth v. Thompson,* 543 Pa. 634, 674 A.2d 217, 222–23 (1996). The sole requirement is that the instructions properly and adequately assess the law. *Id.* In digesting this issue, we believe that the jury instructions, viewed in their entirety, adequately apprised the jury that Appellant could only be convicted of first-degree murder if he harbored the specific intent to take the victim's life.

Appellant attempts to liken facts here to those in *Commonwealth v. Huffman,* 536 Pa. 196, 638 A.2d 961 (1994), and argues that the rationale in *Huffman* mandates a new trial. In *Huffman,* this Court confronted an issue identical to the one presented here: whether the trial court properly instructed the jury regarding principles of accomplice and conspiratorial liability where defendant also faced charges of first-degree murder. In *Huffman,* the defendant conspired with another man to burglarize a place of business and, during the burglary, one or both of the conspirators killed a woman who was present at the site. At the defendant's trial on various

charges, including first-degree murder and conspiracy, the trial court instructed the jury as follows:

> Thus, in order to find a Defendant guilty of murder in the first degree, you must find that the Defendant caused the death of another person, or that an accomplice or co-conspirator caused the death of another person. That is, you must find that the Defendant's act or the act of an accomplice or co-conspirator is the legal cause of death of [the victim], and thereafter you must determine if the killing was intentional.

*Id.* at 962. Subsequent to examining the jury instruction of the trial court in *Huffman,* we held that "[u]nder the contested instruction, the jury needed to find only that the appellant had conspired to commit or assisted in a burglary with the actual murderer in order to find him guilty" of first-degree murder. *Id.* at 963. As such, we reversed the defendant's conviction and remanded for a new trial because the trial court did not properly instruct the jury as to the need for the defendant to have harbored his own specific intent to kill, which would support a first-degree murder conviction.

We are unconvinced by Appellant's attempt to analogize the jury instructions in the present proceedings to those given in *Huffman.* In the instant case, the trial court stressed in its instructions to the jury that Appellant's state of mind as it related to the charge of first-degree murder was to be examined separately and independently from that of his co-conspirators. Also, the trial court in this case communicated to the jury that Appellant had to maintain his own specific intent to kill in order to support a finding of first-degree murder. The trial court's later instructions pertaining to accomplice and conspiratorial liability did not detract from the clear message that the jury must find that the Appellant had the specific intent to kill to support a first-degree murder conviction. Moreover, contrary to Appellant's attempts to couple the jury instructions in *Huffman* with those given here, the jury instructions given in the present case are similar to those already validated by this Court in other cases. *See Commonwealth v. Thompson,* 543 Pa. 634, 643–46, 674 A.2d 217, 222–23

(1996) (stating charge "adequately and correctly established the requirements which the jury must find in order to render a verdict on the issue of accomplice liability for first degree murder"); *Commonwealth v. Chester,* 526 Pa. 578, 611–15, 587 A.2d 1367, 1384–85 (Pa.), *cert. denied,* 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991) (holding accomplice liability instruction sufficient when trial court separately explained to jury that specific intent to kill must be found to support first-degree murder conviction).

We believe that the trial court properly informed the jury that it must find that the Appellant individually harbored the specific intent to kill the victim to be convicted for first-degree murder. After reviewing the instructions given to the jury, we find that they were consistent with our decision in *Wayne* and like the jury instructions previously validated by this Court. Thus, Appellant's argument here fails.

### D. Prosecutor's Comment Regarding Possibility of Pardon

In addition, Appellant argues that a question posed by the prosecutor during the penalty stage of his trial regarding the possibility of a pardon was grounds for a mistrial. While Appellant recognizes that the cases he relies on concern a prosecutor injecting parole considerations at the penalty stage, Appellant believes that the same concerns apply even more forcefully to the injection of the possibility of a pardon. In essence, Appellant argues that the prosecutor's question wrongly permitted the jury to base its death sentence on the possibility that Appellant could receive a pardon while serving a life sentence.

The penalty phase of Appellant's trial, like the guilt phase, was held jointly with that of his co-conspirator, Bowers. In attempting to convince the jury at the penalty proceedings to render a life sentence, Bowers' counsel, during his direct examination of Bowers' mother and father, endeavored to communicate to the jury that a life sentence was without parole and that, as such, there was no possibility that Bowers would ever be released from prison if the jury returned a life sentence. Defense counsel asked Bowers' mother during his

direct examination: "You understand the other option is life imprisonment without parole, *he'll never be released from jail?* " (N.T. 12/18/97, p. 49 (emphasis added).) Counsel later followed this same strategy with Bowers' father, asking him: "By way of life imprisonment, sir, you understand that that's life without parole and *[Bowers] will never be released?* " (N.T. 12/18/97, p. 60 (emphasis added).) It was only after Bowers' counsel broached the issue of a life sentence meaning life in prison without parole that the prosecutor countered with the possibility that Bowers could be pardoned. The prosecutor posed the following as his final question to Bowers' father on cross-examination: "Just one last question, Mr. Davenport. [Defense counsel] said do you know that if [Bowers] gets life it's without parole. *Do you also know that there's always the possibility of a pardon, did [defense counsel] tell you that too?* " (N.T. 12/18/97, p. 64 (emphasis added).)

Bowers' attorney objected to the prosecutor's question and moved for a mistrial. The trial court sustained the objection and immediately gave the following instruction:

> Members of the jury, I am telling you without any chance of being in error so you will understand it completely, thoroughly and throughout, you have two options in this case: *to find the defendant and sentence him to death or to sentence him to life imprisonment without parole.* That's it and nothing else should be in your mind and that's an inappropriate question.

(N.T. 12/18/97, pp. 64–65 (emphasis added).) At the request of Bowers' attorney, the trial court then held a conference in chambers to address Bowers' motion for a mistrial. At this juncture, Appellant's counsel joined the motion, as he believed that the improper question was equally prejudicial to Appellant.[19] The trial court denied the joint motion for a mistrial concluding that, while the question was improper and should

---

**19.** Appellant's own counsel revisited the "life means life" issue later in the penalty proceedings by asking Appellant's cousin: "Do you understand that if he is sentence[d] today to life imprisonment, it's without parole?" (N.T. 12/18/97, p. 91.) The prosecutor refrained from raising the possibility of a pardon at this point.

not have been asked, the prompt jury instruction remedied any possible prejudice.[20]

■ Appellant's argument that the prosecutor's statement necessitated a mistrial does not influence us. The prosecutor's question was of such a fleeting nature that it is highly unlikely that it prejudiced the Appellant. The prosecutor's question, to which an objection was immediately sustained and no response was ever given, was of such an insubstantial character that it is extremely improbable that the jury based its death sentence on the possibility that Appellant could receive a pardon. That the jury rendered a sentence of death as a result of the prosecutor's question is even more unlikely considering the fact that the question made no reference to future dangerousness, the element that makes allusions to pardon or parole most prejudicial. *See Commonwealth v. Simmons,* 541 Pa. 211, 250, 662 A.2d 621, 640 n. 14 (1995) ("The injection of parole is more serious and plainly prejudicial if the prosecutor also speculates as to what a defendant might do if released from jail.").[21]

**20.** The trial court stated:

> I'm not going to grant the mistrial but I do believe that it was an improper question and should not have been asked, and I think the strength of my prompt response to the jury and the manner in which I addressed them and the fact that I made it very crystal clear that there is no option except life without parole or the death penalty has cured that defect.

(N.T. 12/18/97, p. 74.)

**21.** Appellant does not contend that the prosecutor's question placed his future dangerousness at issue. However, even assuming that the jury could somehow extract from the prosecution's question that Appellant could pose a future danger to society if given a life sentence, a mistrial would still not be warranted in light of the instruction given by the court. The trial court clearly expressed to the jury that it was to disregard the question. Additionally, the trial court instructed the jury that it was to consider only whether to sentence the Appellant to death or to sentence him to life imprisonment without parole. Certainly, the prompt and concise instruction cured any possible prejudice.

It is also worth highlighting that the jury was instructed that a life sentence in Pennsylvania precludes the possibility of parole. (*See* N.T. 12/18/97, p. 64–65) Thus, assuming that future dangerousness was put into issue, the trial court's instruction would suffice to satisfy the requirements of *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), and would further satisfy the minority

■ Furthermore, this Court has found that a mistrial is not warranted when a prosecutor's allusion to the possibility of a pardon or a commutation, viewed in the proper context, was a fair retort to defense counsel's comments regarding the issue of "life means life." *Commonwealth v. Marrero*, 546 Pa. 596, 687 A.2d 1102 (1996), *cert. denied*, 522 U.S. 977, 118 S.Ct. 434, 139 L.Ed.2d 334 (1997) (finding that prosecutor's comments regarding commutation "were a fair response to defense counsel's anticipated argument that a life sentence meant that [the defendant] would spend his entire life in prison"); *Commonwealth v. Clayton*, 516 Pa. 263, 532 A.2d 385 (1987) (holding that prosecutor's comment that people sentenced to life imprisonment do not always spend the rest of their lives in jail was proper response to defense counsel's factually misleading statements on commutations). The prosecutor's comments in the present case were a fair response to defense counsel's unveiled attempts to impart to the jury that there was no possibility that a defendant would ever be released from prison if given a life sentence.

The trial court did not err when it refused to grant the joint motion for a mistrial. The prosecutor's question was a fair retort to the defense's position and did not broach the issue of future dangerousness. In any event, the forceful instruction of the trial court promptly rectified any alleged prejudice.

E. Prosecutor's Reference to Murder as an Execution

■ Additionally, Appellant claims that the prosecutor's reference to the murder as an execution in his closing argument at the guilt stage was improper and warranted a mistrial. Appellant believes that the unavoidable effect of the prosecutor's characterization of the murder as an execution was to create such a bias and hostility by the jury so as to hinder an objective weighing of the evidence, and as a result,

view of this Court that a standard *Simmons* instruction should be given in every capital case. *See Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344 (1998) (Flaherty, C.J., dissenting; Zappala, J., concurring); *Commonwealth v. Clark*, 551 Pa. 258, 710 A.2d 31 (1998) (Zappala, J., concurring; Nigro, J., concurring); *Commonwealth v. May*, 551 Pa. 286, 710 A.2d 44 (1998) (Zappala, J., concurring; Nigro., J., concurring).

the trial court erred in denying Appellant's motions for a mistrial as to this issue. Specifically, Appellant takes exception to the following comment, made by the prosecutor near the culmination of his closing argument: "They said give us the money or we're going to kill him and they carried it out, executed him." (N.T. 12/15/97, p. 165.)

A prosecutor is permitted to argue only those inferences that can be reasonably derived from the evidence at trial. *Commonwealth v. Miles*, 545 Pa. 500, 512–13, 681 A.2d 1295, 1301 (1996). However, as long as there is a reasonable basis in the record for the prosecutor's comments we will allow the prosecution to advocate the Commonwealth's position zealously. *Id.* at 1302. We will only reverse the trial court's denial of a motion for a mistrial "if the unavoidable effect of the prosecutor's comment is to create hostility against the defendant such that the jury is hindered in its job of objectively weighing the evidence." *Id.*

The prosecutor's argument that the Appellant and his co-conspirators "executed" the victim was reasonable based on the record in this case and did not prevent the jury from fairly assessing the evidence. The prosecution presented evidence that Appellant and his co-conspirators kidnapped the victim and then demanded ransom in exchange for his life. The victim was later found in a vacant lot, with his hands tied behind his back, a hat covering his face and four bullet wounds to the back of this head. Clearly, a fair inference that can be drawn from this evidence was that Appellant and his co-conspirators executed the victim after they realized that their ransom demands would not be satisfied.

The characterization of the murder as an execution was well within the bounds of acceptable prosecutorial advocacy. As a result, the trial court did not abuse its discretion in denying Appellant's motion for a mistrial on this issue, and Appellant cannot succeed in this argument.

## III. STATUTORY REVIEW OF DEATH SENTENCE

Having concluded that Appellant's claims for relief are without merit, we must, in compliance with our statutory

duty pursuant to 42 Pa.C.S.A. § 9711(h)(3), affirm the sentence of death unless we determine that: "(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance." Our review of the record reveals that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor. Furthermore, when we examine whether the evidence supports the finding of at least one aggravating circumstance, we are convinced that the Commonwealth succeeded in establishing three aggravating circumstances beyond a reasonable doubt.

## IV. CONCLUSION

For the foregoing reasons, we affirm the verdict and sentence of death and direct the Prothonotary to transmit the record in this matter to the Governor.

Justice CASTILLE files a concurring opinion.

CASTILLE, Justice, concurring.

I join the majority opinion, except for its discussion of the adequacy of the trial court's charge on specific intent, conspiracy and accomplice liability, under *Commonwealth v. Wayne*, 553 Pa. 614, 720 A.2d 456 (1998), *cert. denied, Wayne v. Pennsylvania*, —— U.S. ——, 120 S.Ct. 94, 145 L.Ed.2d 80 (1999), and *Commonwealth v. Huffman*, 536 Pa. 196, 638 A.2d 961 (1994). As I explained more fully in my concurring opinion in *Commonwealth v. Hannibal*, 562 Pa. 132, 753 A.2d 1265 (2000) (Castille, J., concurring), I disagree with the notion, first embraced in *Wayne*, that the seriousness of the penalty involved in first degree murder prosecutions requires that the specific intent element should be elevated above principles of conspiratorial liability. There is no reason, in the Crimes Code, in experience, or in logic, to distinguish first degree murder from other crimes in determining the reach of conspiracy liability.

I would return to pre-*Wayne* law and reinstate the long-standing principle that, in a conspiracy, " 'the least degree of concert or collusion between parties to an illegal transaction makes the act of one the act of all.' " *Commonwealth v. Strantz*, 328 Pa. 33, 40, 195 A. 75, 79 (1937) (*citing* Chief Justice Gibson in *Rogers v. Hall*, 4 Watts 359, 361 (1835)). The Commonwealth should not need to prove that each participant in a conspiracy had the specific intent to kill for liability to attach. If one actor in a conspiracy acts on a specific intent to kill, and that act furthered the common design, then conspiracy liability should attach to all conspirators. Notwithstanding *Wayne*, the legislature can reestablish this traditional rule through appropriate modifications of the Crimes Code.[1]

In this case, the trial court fully and accurately charged the jury on first degree murder, conspiracy and accomplice liability. That is all I would require.

I would also note that the "*Huffman* issue" here, under any formulation, is not even invoked. This conspiracy specifically contemplated murder. The threat conveyed by the conspirators to the victim's friend and brother was to pay a ransom or they would kill the victim—which is exactly what they did. Even a faulty "*Huffman* charge," on these facts, would have been harmless. *See Wayne*, 553 Pa. at 633, 720 A.2d at 465.

---

1. The majority characterizes *Wayne* as "reconciling the conflict between conspiracy liability and the specific intent requirement of first-degree murder." Op. at 273, 754 A.2d at 1273. The General Assembly can remove that perceived conflict, should it so choose, by addressing the matter.