J-S13040-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DERRICK SHIELDS | : | |
| | : | |
| Appellant | : | No. 1128 EDA 2020 |

Appeal from the Judgment of Sentence Entered on February 4, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0006254-2018

BEFORE:  OLSON, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED JUNE 09, 2021**

Derrick Shields (Shields) appeals from the February 4, 2020 judgment

of sentence[1] imposed by the Court of Common Pleas of Philadelphia County

(trial court) following his conviction by jury of second-degree murder, robbery

and conspiracy.[2]  Shields argues that the trial court abused its discretion in

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Shields' March 30, 2020 notice of appeal purports to appeal from the March 13, 2020 order denying his timely post-sentence motion.  The notice of appeal also incorrectly identified that order as the denial of a petition pursuant to the Post-Conviction Relief Act.  **See** 42 Pa.C.S. §§ 9541 *et seq.*  "In a criminal action, appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions."  **Commonwealth v. Shamberger**, 788 A.2d 408, 410 n.2 (Pa. Super. 2001) (*en banc*) (citation omitted).  We have amended the caption accordingly.

[2] 18 Pa.C.S. §§ 2502(b), 3701(a)(1)(i), & 903.

denying his motion for a mistrial after the Commonwealth impermissibly shifted the burden of proof in its closing argument. We affirm.

**I.**

The trial court set forth the relevant facts in this matter as follows:

Dennis Reynolds, a co-operating co-defendant, who pleaded guilty to the murder of the Timothy Manning (the "decedent"),[] testified that he was business partners and friends with the decedent. He had known the decedent for about four or five months prior to the murder. The decedent was leveraging his job as a banker for Wells Fargo to help Reynolds start a legal cannabis farm in California.

Prior to meeting the decedent, Reynolds had been selling cannabis illegally since 2013. Reynolds' primary business partner in his illegal cannabis trade was his younger brother Jody Reynolds ("Jody"). Reynolds ran the illegal operation in Philadelphia, and Jody ran the illegal operation in Georgia. In 2015, Reynolds decided he wanted to go completely legitimate by starting a marijuana grow business where it was legal. However, when he told Jody about his plans to make the operation legal, Jody became upset and their relationship deteriorated.

Eventually, Reynolds agreed to give his entire illegal business, including all of his dealers and clients to Jody, in exchange for being able to walk away from the business and start a legitimate grow operation. In December of 2016, Reynolds met [Shields] for the first time.[] [Shields] worked for Jody and was going to be taking over Reynolds' Philadelphia business. In March of 2017, [Shields] travelled to Philadelphia to take over Reynolds' business.

When [Shields] arrived in Philadelphia he stayed at Reynolds' house on the 4400 block of 15th Street and used one of Reynolds' cars to get around. Reynolds began the process of introducing [Shields] to all of Reynolds' contacts and transferring over his business to [Shields]. Reynolds did not introduce [Shields] to the decedent since the decedent was going to be involved in Reynolds' legitimate business enterprise and Reynolds didn't want to mingle his legal and illegal businesses.

- 2 -

On the day of March 23, 2017, the decedent contacted Reynolds looking to purchase two pounds of marijuana. Reynolds did not have two pounds of marijuana readily available so he attempted to procure it from one of his dealers. Throughout the day, Reynolds was in contact with the decedent, using both of the decedent's phone numbers. At around 8:00 or 9:00 p.m., the decedent called Reynolds to arrange a time to meet. Reynolds answered the call on speakerphone and [Shields] overheard the conversation.

Reynolds told [Shields] that this was a "one-time only situation," so there was no point in [Shields] meeting the decedent as a future customer. [Shields] told Reynolds that because this was a "one-time only situation" they would be better off robbing the buyer rather than selling the weed.[6] Reynolds was unable to convince [Shields] otherwise, and eventually consented to the robbery because he was afraid of [Shields] and Jody. [Shields] was carrying a .357 caliber Glock so Reynolds assumed that [Shields] would use it to threaten the decedent during the robbery.

> [6] Even though the decedent was buying two pounds of marijuana, the profit was only going to be $400.

Reynolds and [Shields] took separate cars to meet the decedent. The plan was for Reynolds to sell the weed to the decedent, and then as the decedent was walking back to his car, [Shields] would "coincidently" rob him. When Reynolds and [Shields] arrived at the meet up point, [Shields] parked out of sight around the corner, and Reynolds continued on to the final destination. Reynolds picked the decedent up from the corner of 5th Street and 65th Avenue and drove back to where [Shields] was parked. Reynolds and the decedent made small talk and Reynolds gave the decedent a sample bag of marijuana as they counted out the money.

While the decedent and Reynolds were conducting their business, [Shields] was texting Reynolds telling him to hurry things up. Eventually, Reynolds and the decedent finished counting the money and exited the vehicle to get the marijuana from the trunk. Reynolds handed the decedent the bag containing the marijuana and they parted ways. As Reynolds was walking back to the front of his car, he saw [Shields] walking towards the decedent. When Reynolds got into his car, he heard a gunshot. He looked in his

rearview mirror and saw [Shields] running with a gun and the bag containing the marijuana.

Reynolds drove off and called the decedent. The decedent did not answer his phone. He sent the decedent a text. When he did not receive a response, he called [Shields] and asked him if he shot the decedent. [Shields] said "yes." He asked [Shields] why he did that and [Shields] said that he didn't want to talk about it on the phone. The next morning, Reynolds again asked [Shields] why he shot the decedent, and [Shields] said "that he didn't feel like chasing him."

\*\*\*

At trial, Reynolds identified transcripts of text messages he exchanged with the decedent and [Shields] as well as the phone numbers for each of them. Reynolds identified the phone number for his burner phone as (747) 273-3783 (hereinafter "Reynolds' phone"); the decedent's burner phone number as (470) 346-7611 (hereinafter "the decedent's burner"); the decedent's iPhone number as (215) 888-1178 (hereinafter "the decedent's iPhone"); and [Shields'] burner phone number as (706) 562-5443 (hereinafter "[Shields'] phone").

Special Agent William Shute, a member of the FBI Cellular Analysis Survey Team, outlined the call and text records and the historical cellphone location data associated with each phone. The first cell phone analyzed by Agent Shute was the decedent's burner phone which was recovered from the crime scene. Thereafter, Agent Shute was able to secure a warrant for Reynolds' burner phone data and retrieved the data associated with the Reynold's phone.

Agent Shute read into the record a text message exchange between Reynolds and [Shields] that occurred immediately prior to the murder. At 9:52 p.m., Reynolds texted [Shields] saying, "he got money." [Shields] replied, "handle it." At 9:54 p.m., [Shields] texted Reynolds "wya."[8] Reynolds replied, "in front of you... I got my headlights on." At 9:57 p.m., [Shields] texted, "ok I see you, make him get out."

_____

[8] A common abbreviation for "where you at."

Agent Shute also testified as to the historical cell phone location data. From January 1, 2017, until February 28, 2017, [Shields'] burner phone was predominately in the Columbus, Georgia area, most frequently used in the area of 2729 Auburn Avenue.[] At 3:09 a.m., on February 28, 2017, [Shields'] burner phone was used for the last time in Georgia. [Shields'] burner phone was next used at 7:47 a.m., on February 28, 2017, in the vicinity of Philadelphia International Airport. From February 28, 2017, until March 23, 2017, the majority of [Shields'] burner phone usage was in the area of 4535 North 15th Street (hereinafter "Reynolds' House").[10]

> [10] [] Reynolds testified that [Shields] was staying at Reynolds' house on the 4400 block of 15th Street.

At 9:15 p.m., on the night of the murder, [Shields'] phone was used in the area of Reynolds' House. At 9:25 p.m., [Shields'] phone was utilizing a cell phone tower just south of 500 West 65th Avenue (hereinafter "the crime scene").[] At 9:41 p.m., 9:49 p.m., 10:04 p.m., and 10:05 p.m., [Shields'] phone was utilizing the cell site adjacent to the crime scene. The phone was used one more time that night at 11:26 p.m., in the Cheltenham area of Pennsylvania. The next time [Shields'] phone was used was 8:15 and 8:22 a.m., on March 24, 2017, in the vicinity of Reynolds' House.

Between 8:45 p.m., and 9:00 p.m., on March 23, 2017, Reynold's phone was utilizing cell phone towers in the vicinity of Reynolds' House. At 9:49 p.m., and 9:53 p.m., Reynold's phone was utilizing cell phone towers in the area of the crime scene.

***

John Wright Jr., testified that on March 23, 2017, the decedent called him in the evening and asked him if he could give him a ride to "pick up some weed." The decedent arrived at Wright's house in Northeast Philadelphia and Wright gave him a ride to 5th Street and 65th Ave., where the decedent exited Wright's car and walked up 5th Street. About 15 to 20 minutes later, Wright heard gunshots. Immediately after he heard the gunshots, Wright saw a man run across 65th Avenue and down Fairhill Street. . . .

Mary Swihart testified that she lives on the corner of Fairhill and 65th Street in Philadelphia. On the night of March 23, 2017,

between 9:30 p.m., and 10:00 p.m., she observed a car parked on the corner of her street as she was pulling down her shades. Upon turning away from the window, she heard two gunshots. She returned to the window and observed the same car take off up 65th Avenue towards 6th Street. An individual ran from where that car had been parked down Fairhill Street and hopped into a second vehicle. . . .

Trial Court Opinion, 8/26/20, at 2-8 (cleaned up; citations omitted).

Shields proceeded to a jury trial on January 27, 2020. In closing, Shields argued that the Commonwealth had not proven Shields' involvement in the murder beyond a reasonable doubt and focused primarily on the credibility of Reynolds, the cooperating co-conspirator. He argued that Reynolds had orchestrated the murder when the decedent failed to deliver promised investors for his legal marijuana business, and that the cell phone analysis did not prove that Shields was in possession of the burner phone on the night of the murder. He argued that the burner phone that purportedly belonged to him was used a week after the shooting by an unknown third party who sent nude photographs to Reynolds. Finally, the defense pointed out that several potentially relevant individuals had not testified at trial: Reynolds' girlfriend, with whom Shields was romantically involved; Reynolds' "enforcer" for his illegal marijuana business; and one of the detectives.

In its closing argument, the Commonwealth made the following comment:

What you have to consider is the evidence that you actually heard in this case. You have to consider the testimony that you have heard in this case, and let's be clear, the Defense has no burden to present any evidence or any testimony at all. Let's make that

very clear, but let's also be clear that the Defense has the same subpoena power for witnesses that the Commonwealth has.

Notes of Testimony, 2/3/20, at 134-35. Defense counsel immediately objected and the trial court sustained the objection but denied the subsequent motion for a mistrial. The jury ultimately found Shields guilty of the above-mentioned charges and the trial court imposed the mandatory sentence of life imprisonment for second-degree murder, with no further penalty on the remaining charges.

Shields filed a timely post-sentence motion which the trial court denied. Shields filed a timely notice of appeal and he and the trial court have complied with Pa.R.A.P. 1925.

**II.**

Shields raises one issue on appeal: whether the trial court abused its discretion in denying his motion for a mistrial after the prosecutor shifted the burden of proof in its closing argument.[3] The trial court concluded that the prosecutor did not shift the burden of proof with its closing, and that the statement was a fair response to Shields' closing argument regarding the

_____

[3] "The trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury, and as such, the grant or denial of a mistrial will not be overturned absent an abuse of discretion." *Commonwealth v. Simpson*, 754 A.2d 1264, 1272 (Pa. 2000) (citation omitted). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. . . discretion is abused." *Commonwealth v. Fortenbaugh*, 69 A.3d 191, 193 (Pa. 2013) (citation omitted).

witnesses who had not been called to testify at trial. Trial Court Opinion, 8/26/20, at 11-12. Further, it concluded that if any prejudice resulted from the statement, it was ameliorated when the trial court instructed the jury that the Commonwealth bore the sole burden of proof at trial and that the defense had no obligation to present evidence. *Id.* at 12.

Initially, we note that

> A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. A mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice.

*Commonwealth v. Cash*, 137 A.3d 1262, 1273 (Pa. 2016) (cleaned up). Thus, a mistrial is an extreme remedy only warranted when the prejudice to the movant cannot be ameliorated so as to ensure a fair trial.

When a motion for a mistrial is based on alleged prosecutorial misconduct in closing arguments, "[i]n reviewing prosecutorial remarks to determine their prejudicial quality, comments cannot be viewed in isolation but, rather, must be considered in the context in which they were made." *Commonwealth v. Judy*, 978 A.2d 1015, 1019 (Pa. Super. 2009) (citation omitted). Prosecutors are permitted leeway to fairly respond to arguments made by the defense. *Id.* at 1020. Improper comments by a prosecutor do not constitute reversible error "unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence

objectively and render a true verdict." ***Commonwealth v. Hawkins***, 701 A.2d 492, 503 (Pa. 1997). However, it is well-settled that the Commonwealth bears the "never-shifting burden to prove each element of the crime charged beyond a reasonable doubt" and a criminal defendant has no duty to produce evidence in his own defense at trial. ***Commonwealth v. Cosnek***, 836 A.2d 871, 874 (Pa. 2003).

Here, the prosecutor began her statement by saying "let's be clear, the Defense has no burden to present any evidence or any testimony at all." Notes of Testimony, 2/3/20, at 134. When she went on to say that Shields had "the same subpoena power for witnesses that the Commonwealth has," the trial court immediately sustained Shields' objection. ***Id.*** at 134-35. The trial court explained the burden of proof at length in the opening and closing instructions to the jury, emphasizing that Shields had no burden of producing evidence at trial.[4] Notes of Testimony, 1/27/20, at 211-12; 2/4/20, at 9-10. We presume that juries follow the trial court's instructions. ***Commonwealth v. Fletcher***, 41 A.3d 892, 896 (Pa. Super. 2012).

Viewed in this context, we agree that Shields has not established that the prosecutor's closing argument shifted the burden of proof to the defense or had the "unavoidable effect [of] depriv[ing] the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." ***Cash***,

---

[4] Shields did not request a cautionary instruction when he objected to the prosecutor's statement in closing argument.

*supra*; *Hawkins*, *supra*. The statement was not an attempt to shift the burden of proof, as immediately before the objected-to argument, the prosecutor emphasized that Shields had no burden to present evidence or call witnesses at trial. *Judy*, *supra* (holding that statements forming the basis for alleged prosecutorial misconduct are reviewed within their greater context). Additionally, the argument was offered in response to Shields' closing, in which he advanced an alternative theory that Reynolds had orchestrated the murder and faulted the Commonwealth for failing to call witnesses that would have been relevant to Reynolds' motive. *See Commonwealth v. Sneed*, 45 A.3d 1096, 1112 (Pa. 2012) (finding "no merit to the allegation that the prosecutor shifted the burden of persuasion by commenting on Appellant's failure to substantiate his contention that another individual committed the crime" when defense argued in closing that one of the Commonwealth's witnesses committed the murder). Based on this full context for the prosecutor's closing argument, the extreme remedy of a mistrial was not warranted. As the trial court did not abuse its discretion in denying Shields' motion for a mistrial, this claim is meritless.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 6/9/2021*