J-S37015-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| EMANUEL RIVERA | |
| Appellant | No. 1774 MDA 2013 |

Appeal from the Judgment of Sentence July 31, 2013
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-CR-0006999-2012,
CP-67-CR-0007000-2012

BEFORE:  LAZARUS, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED DECEMBER 02, 2014**

Emanuel Rivera appeals from the judgment of sentence imposed by the Court of Common Pleas of York County following his convictions for first-degree murder,[1] robbery,[2] and conspiracy to commit robbery,[3] arising out of a shooting in York on May 28, 2012, and conspiracy to commit robbery and conspiracy to commit burglary[4] arising out of a shooting in York on May 31, 2012.  We affirm based on the thorough opinion authored by the Honorable Richard K. Renn.

_____

[1] 18 Pa.C.S. § 2502(a).

[2] 18 Pa.C.S. § 3701(a)(1)(i).

[3] 18 Pa.C.S. §§ 903(c); 3701(a)(1)(i).

[4] 18 Pa.C.S. §§ 903(c); 3502(a).

Evidence presented at trial established that on the evening of May 28, 2010, Rivera and Eric Camacho-Rodriguez approached the victim, Felipe Bernabe, who was standing near his truck on the 600 block of Girard Avenue in York. Rivera tried to get Bernabe to hand over his keys, and when Bernabe refused, Rivera fatally shot him in the back.

A few days later, on May 31, 2010, Camacho-Rodriguez telephoned his friend Jaycott Rivera (Jaycott) who, unbeknownst to him, had acted as a confidential informant for the York Police Department in the past. Camacho-Rodriguez arranged to go to Jaycott's house with Rivera. While there, Rivera stated that he pulled the trigger during the Bernabe killing. Camacho-Rodriguez and Rivera enlisted Jaycott's help to get money and leave town. The initial plan was to go to Harrisburg, but Jaycott suggested that they rob an individual in York known as "Movie Man."

Rivera, Camacho-Rodriguez, and Jaycott went to "Movie Man's" house to reconnoiter the scene of the intended crime. On the way, they stopped in a park and arranged by telephone for a fourth man to deliver to them a bag containing ski masks. Once the ski masks were delivered, Camacho-Rodriguez requested that Jaycott hide the masks in the woods. They then returned to Jaycott's house where Jaycott overheard Rivera say they were going to kill "Movie Man." At this point, Jaycott had his wife contact the police, which eventually led to the arrest of Rivera and Camacho-Rodriguez.

A jury found Rivera guilty on June 7, 2013, and on July 31, 2013, the court imposed a sentence of life in prison, plus four to eight years. On

August 9, 2013, Rivera's counsel filed post-sentence motions, which the court denied by order dated August 28, 2013. Counsel filed a timely notice of appeal on September 27, 2013, and by order filed October 2, 2013, the trial court directed Rivera to file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Rivera did not file a Rule 1925(b) statement, and on December 4, 2013, the trial court issued a short Rule 1925(a) opinion noting the lack of a Rule 1925(b) statement. The trial court stated, "a review of the transcript of the trial, the findings made by the [t]rial [c]ourt during the trial and sentencing fully supports the [t]rial [c]ourt's decisions made therein." Trial Court Opinion, 12/4/13, at 1-2.

On June 24, 2014, we remanded for the filing of a Rule 1925(b) statement *nunc pro tunc* and for the preparation of an opinion by the trial court.[5]

---

[5] We relied on Pa.R.A.P. 1925(c), which provides:

> If an appellant in a criminal case was ordered to file a Statement and failed to do so, such that the appellate court is convinced that counsel has been per se ineffective, the appellate court shall remand for the filing of a Statement nunc pro tunc and for the preparation and filing of an opinion by the judge.

Pa.R.A.P. 1925(c).

Rivera filed a Rule 1925(b) statement on July 23, 2014, and on October 20, 2014, Judge Renn, to whom the case had been reassigned, filed an opinion.

On appeal, Rivera challenges the sufficiency of the evidence to support his conviction for first-degree murder and the weight of the evidence to support his other convictions.

Where an appellant challenges the sufficiency of the evidence, this Court "must determine whether the evidence and all reasonable inferences deducible therefrom, when viewed in the light most favorable to the verdict-winner . . . are sufficient to establish all elements of the crime charged beyond a reasonable doubt." *Commonwealth v. Rakowski*, 987 A.2d 1215, 1217 (Pa. Super. 2010) (quoting *Commonwealth v. Parker*, 957 A.2d 311, 317 (Pa. Super. 2008) (citations omitted)). "The trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Commonwealth v. Abed*, 989 A.2d 23, 26 (Pa. Super. 2010).

With respect to the elements of first-degree murder, our Supreme Court has stated:

> To sustain a conviction for first-degree murder, the Commonwealth must prove that the defendant acted with the specific intent to kill, that a human being was unlawfully killed, that the accused did the killing and that the killing was done with deliberation. It is the specific intent to kill which distinguishes murder in the first degree from lesser grades of murder. This Court has held repeatedly that the use of a deadly weapon on a vital part of a human body is sufficient to establish the specific intent to kill.

*Commonwealth v. Simpson*, 754 A.2d 1264, 1269 (Pa. 2000) (citations and quotations omitted).

In his Rule 1925(a) opinion, Judge Renn thoroughly reviewed Rivera's sufficiency of the evidence claim with respect to first-degree murder, and concluded that the Commonwealth's evidence established Rivera's guilt beyond a reasonable doubt.  Accordingly, we rely on Judge Renn's opinion and affirm the conviction on that basis.

Rivera next challenges the weight of the evidence to support his conviction for robbery and conspiracy to commit robbery and burglary.

Our Supreme Court has set forth the following standard of review for claims that the verdict is against the weight of the evidence:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witness.  An appellate court cannot substitute its judgment for that of the finder of fact.  Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice.  Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence.  Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa 2003) (citations omitted).

In his Rule 1925(a) opinion, Judge Renn methodically reviewed the evidence presented by the Commonwealth, and determined that Rivera's convictions for robbery and conspiracy did not shock the court's conscience.

We find no abuse of discretion on the part of the trial court, which reviewed Rivera's weight of the evidence claims thoroughly and dispassionately.

After careful review of the parties' briefs, the record and the relevant law, we agree with Judge Renn's analysis and affirm based on his well-reasoned opinion. We instruct the parties to attach a copy of Judge Renn's decision in the event of further proceedings.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/2/2014



2014 OCT 30 PM 3: 49

# IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA CRIMINAL DIVISION

| | | |
|---|---|---|
| Commonwealth of Pennsylvania | : | CP-67-CR-0006999-2012 |
| | : | CP-67-CR-0007000-2012 |
| vs. | : | |
| | : | Super. Ct. No. 1774 MDA 2013 |
| Emanuel Rivera | : | |
| | : | |

## OPINION PURSUANT TO RULE 1925(a) OF THE PENNSYLVANIA RULES OF APPELLATE PROCEDURE

On June 7, 2013, the Appellant, Emanuel Rivera, was found guilty of the following: in case 6999-2012, Count 1 murder in the first degree,[1] Count 2 robbery,[2] and Count 3 criminal conspiracy to commit robbery[3]; in case 7000-2012, Count 2 criminal conspiracy to commit robbery,[4] and Count 3 criminal conspiracy to commit burglary.[5] The Appellant was sentenced on July 31, 2013. On August 9, 2013, the Appellant filed a Post-Sentence Motion, which was denied on August 28, 2013. The Appellant filed a timely Notice of Appeal to the Superior Court on September 27, 2013. The Appellant was directed to file a Concise Statement of the Matters Complained on October 2, 2013. The Appellant failed to file his 1925(b) Statement, so, on December 4, 2013, this Court submitted its 1925(a) Opinion noting the absence of a concise statement and urging the appellate court to affirm.[6]

---

[1] 18 Pa. C.S.A. § 2502(a).
[2] 18 Pa. C.S.A. § 3701(a)(1)(i).
[3] 18 Pa. C.S.A. §§ 903(a)(1), 3701(a)(1)(ii).
[4] 18 Pa. C.S.A. §§ 903(a)(1), 3701(a)(1)(iii).
[5] 18 Pa. C.S.A. §§ 903(a)(1), 3502(a).
[6] We should note that this case was originally in front of another judge on this Court, but was subsequently reassigned to the undersigned judge on July 24, 2014.

1

(2)

The Superior Court, per Rule 1925(c)(3), remanded the case "for a filing of a Statement nunc pro tunc and for the preparation and filing of an opinion by the judge." Pa. R.A.P. 1925(c). The Superior Court gave the Appellant 30 days to file his 1925(b) statement nunc pro tunc. The Trial Court was given 60 days to prepare its 1925(a) Opinion. Because the original judge was unavailable, the case was reassigned to the undersigned judge on July 24, 2014. Due to miscommunication, this Court was unaware of the transfer until October of 2014.

On appeal, the Appellant argues that (1) the Trial Court improperly found there was sufficient evidence to support the conviction of first degree murder; and (2) the verdict on the remaining counts was against the weight of the evidence. The testimony from the Appellant's trial can be found in the original record at Notes of Testimony 6/3-6/7/2013. The testimony from the Appellant's sentencing can be found in the original record at Notes of Testimony 7/31/2013. Pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, the following is our opinion addressing the Appellant's issues on appeal.

**Factual and Procedural History:**

The factual history of these cases is somewhat confusing because they involve two separate occasions and two defendants. The Appellant's co-defendant, Eric Camacho-Rodriguez, cases CP-67-CR-6998-2012 and CP-67-CR-7001-2012, filed a separate appeal and the status of his cases are not relevant to the Appellant's current appeal.

On the night of May 28, 2012, at around 10:23 P.M., Officer Buchkoski of the York City Police Department was dispatched to the 600 block of Girard Avenue for a call of shots fired. (N.T. 6/3-6/7/2013 at 200). Upon arrival, Officer Buchkoski observed a man lying in the middle of the street. (Id. at 201). As Officer Buchkoski

2

approached, he saw two people standing near the victim. (Id.). The victim was shirtless and laying on his back. (Id.). Officer Buchkoski testified that he noticed a large lump on the victim's right side as well as some blood around his back. (Id. at 201-02). Realizing that the victim was still alive, the officer asked the victim if he was able to identify his shooter. (Id. at 202). The victim attempted to speak, but he was unable to. (Id.). The victim was transported to the hospital, but before being taken by ambulance, Officer Buchkoski removed the victim's wallet in an effort to determine his identity. (Id.). On cross-examination, Officer Buchkoski testified that it did not appear that anyone gone through the victim's pockets or taken anything from the victim's wallet. (Id. at 204).

The victim, Felipe Bernabe-Martinez, died from his injuries, so officers began treating the case as a homicide. (N.T. 6/3-6/7/2013 at 220). Detective Jeremy Mayer was dispatched to the scene and was tasked with supervising the crime scene technicians. (Id.). Various pieces of evidence were collected, including swabs from the victim's truck and from the pool of blood in the street. (Id. at 224-25). Those swabs were sent to the Pennsylvania State Police lab for further testing. (Id. at 226). Detective Mayer also testified that a day or so later, at the victim's autopsy, a bullet, as well as bullet fragments, were recovered from the body. (Id. at 233, 238).

Detective Andy Baez was dispatched to the scene in order to conduct interviews and follow up on any leads. (N.T. 6/3-6/7/2013 at 487). Detective Baez interviewed Linda Perez, Karen Ferguson, and Nick Drayden. (Id. at 487-88).

Linda Perez lived across the street from Girard Avenue, and was sitting on her porch with Nick Drayden on the night of the murder. (N.T. 6/3-6/7/2013 at 161-62). Ms. Perez testified that about three minutes after seeing a gray colored car driving down Girard Avenue, she observed two males walking in the park. (Id. at 162). Because of the lights in the park she was able to see what the two men were wearing,

3

but was unable to see their faces. (Id.). Along with noticing what the two men were wearing, she was able to hear some of their conversation. (Id. at 163). Ms. Perez testified that she heard the two men talking in Spanish, so she assumed they were Hispanic. (Id. at 163-64). She identified the two men as wearing "white beaters [sic.]," which she further explained as white tank tops. (Id. at 163). One of the men also had longer hair that was pulled back in what Ms. Perez explained as a bushy ponytail. (Id. at 163-64).

In the meantime, Ms. Perez noticed the victim had arrived at his home, and had just parked his truck. (N.T. 6/3-6/7/2013 at 165). Ms. Perez watched the two men walk towards the victim who was now standing outside of his truck, next to the attached trailer. (Id.). From Ms. Perez's viewpoint, it looked as though the three men were just talking at first. (Id. at 166). But seconds later, Ms. Perez testified that she saw the two men start fighting with the victim, pushing him up against the metal trailer attached to his truck. (Id.). Ms. Perez turned to get the attention of her friend, Nick Drayden, and in that split second she heard a gunshot. (Id.). Upon hearing the gunshot, Ms. Perez ducked, waited for a couple seconds, and then got up to see what happened. (Id.). She saw the two men running away, but she did not see the victim. (Id.). Feeling that something bad had happened, she ran down the street and saw the victim lying in the middle of the street. (Id. at 166-67).

Ms. Perez immediately called 911. (N.T. 63-6/7/2013 at 167). She attempted to talk to the victim, but he was unable to speak. (Id.). She tried to look for any bullet holes, but all she noticed was a large bubble starting to form on the victim's right side. (Id.). When the police arrived, she informed them of what she had witnessed. (Id. at 167-68). On cross-examination, Ms. Perez was asked if she could give any further details regarding the description of the two men she saw walking in the park that night. (N.T. 6/3-6/7/2013 at 169). She indicated that they were both of regular build,

4

but one was skinnier than the other. (Id.). Ms. Perez was not asked, nor did she offer an estimation of the age of the two males.

Officers also interviewed Nick Drayden, who was sitting on the porch with Linda Perez. (N.T. 6/3-6/7/2013 at 177-78). He testified that he noticed two kids walking though the park on the night of the murder. (Id. at 179). He specifically remembered seeing them because he thought to himself that it was late for kids to be out in the park. (Id.). Mr. Drayden estimated the ages of the two males to be around 16 or 17 years old, and he clarified that when he said "kids" he meant someone who was younger than him. (Id.). He testified that one of the males had a t-shirt wrapped around his head "like a turban or wrap." (Id. at 180). Both of the males were wearing "wife beaters" and jeans. (Id. at 180). Mr. Drayden stated that one of them was shorter than the other, and that both were "lighter than me [Mr. Drayden]" in skin tone.[7]

Mr. Drayden continued by indicating that he saw the two males walk towards the victim, who was just getting out of his work truck. (N.T. 6/3-6/7/2013 at 183-84). He stated that he heard and saw a commotion between the three individuals. (Id. at 184). Mr. Drayden testified that he did not see any weapons, but that he heard a gunshot. (Id. at 188). After the gunshot, Mr. Drayden saw the two males run away, and he and Linda Perez went to see what happened. (Id. at 189). Like Ms. Perez, Mr. Drayden indicated that the victim was lying in the middle of the street. (Id.). He noticed the gunshot wound to the victim's back, and testified that the victim attempted to speak, but was unable to. (Id.).

On cross-examination, Mr. Drayden testified that when the two males approached the victim, it looked like they were going to rob the victim. (N.T. 6/3-

---

[7] Nick Drayden is African-American.

5

6/7/2013 at 191). He based his opinion on the fact that one of the males was standing behind the victim, while the other was in front of the victim. (Id.). However, in his first statement to police, Mr. Drayden stated that it looked like the victim knew the two males because of the way the three interacted. (Id. at 192). Mr. Drayden was also pressed on his prior statement to police where he said that he saw the gun. (Id. at 193). Mr. Drayden admitted he said that, but stated what he meant was that he saw the fire from the gunshot, not the gun itself. (Id.).

The last eyewitness interviewed was Karen Ferguson. She was the victim's next door neighbor at the time of the murder. (N.T. 6/3-67/2013 at 206, 208). She had known the victim ever since he moved into the neighborhood approximately 5 years earlier. (Id. at 208). Ms. Ferguson testified that the victim owned his own lawn care business, so he drove a truck. (Id.). She stated that every morning the victim would park his trucks the same way – pulling in the driveway and pulling back out into his space. (Id. at 209).

On the night of May 28, 2012, Ms. Ferguson was visiting with her sister and her sister's grandchildren in Girard Park. (N.T. 6/3-6/7/2013 at 207). While at the park, she noticed a man sitting on the park bench by himself. (Id. at 209-10). She testified that the person sitting on the bench was lighter skinned and had what she described as an afro puff. (Id. at 211). He was wearing what she described as a white t-shirt and jeans. (Id.). Ms. Ferguson saw the individual get up, leave the park, and head west on East South Street. (Id.). Shortly after, Ms. Ferguson left and went home. (Id. at 212).

Ms. Ferguson testified that she was running a bath when her husband yelled for her to come downstairs. (N.T. 6/9-6/7/2013 at 212). At first she ignored his request, but he again yelled, this time adding that someone was lying in the middle of the street. (Id.). Ms. Ferguson went outside and peeked over her porch railing. (Id.).

6

She also saw the victim's oldest daughter outside on their porch. (Id.). She asked the victim's daughter who it was laying in the street, and the daughter replied she did not know. (Id.). As the two got closer, they realized it was Felipe Bernabe-Martinez. (Id. at 212-13).

Still having no solid suspects, York City Police sent the various pieces of evidence collected at the crime scene to Katherine Cross, an expert in forensic biology. (N.T. 6/3-6/7/2013 at 444). On August 8, 2012, Ms. Cross received six items from the York City police: (1) a swab from the tailgate of the victim's truck; (2) fingernails from the victim's right hand; (3) fingernails from the victim's left hand; (4) hairs pulled from the victim's head; (5) a reference DNA sample from the Appellant; and (5) a reference DNA sample from the co-defendant Mr. Camacho-Rodriguez. (Id. at 446). A little over a year later, she received another sample from the barrel and inside bore of a rifle. (Id.).

After explaining what DNA is and the process of DNA extraction, Ms. Cross told the jury her findings. (N.T. 6/3-6/7/2013 at 446-57). The first sample, the swab taken from the tailgate of the victim's truck, was tested for the presence of DNA, but none was found. (Id. at 453). The second sample, the fingernails from the victim's right hand, was tested for DNA and Ms. Cross found the victim's own DNA. (Id. at 453-54). Ms. Cross also compared the DNA found under the victim's right fingernails to the reference samples from the Appellant and his co-defendant. (Id. at 454-55). She was able to exclude both men. (Id. at 455). The third sample, fingernails from the victim's left hand, also tested positive for the presence of DNA. (Id.). The DNA found was consistent with the victim's DNA, and Ms. Cross was able to exclude the Appellant and his co-defendant. (Id.). The fourth, fifth, and sixth samples were just submitted to provide Ms. Cross with reference samples. (Id. at 455-56).

7

The last item was the swab from the rifle. (N.T. 6/3-6/7/2013 at 456). Ms. Cross tested the swab for the presence of DNA, and she was able to find a partial DNA match. (Id. at 456-57). It was a partial profile because she was only able to extract five of the sixteen areas that are looked at when examining DNA. (Id. at 457). Looking at the five areas from the rifle, Ms. Cross compared those same five areas to the reference sample of the victim. (Id.). Four of the five areas matched. (Id.). While Ms. Cross could not state with 100% certainty that the DNA found on the rifle was that of the victim, she did testify that the DNA was consistent with that of the victim. (Id.). She was able to definitively state that the DNA found could not come from either the Appellant or his co-defendant. (Id.). To put this in perspective, Ms. Cross explained that in comparing the partial DNA profile from the rifle to U.S. Caucasians, you would expect to see another consistent match in every one in over 341,000; for U.S. African-Americans every one in over 193,000; for U.S. Hispanics every one in over 97,000; and for U.S. Native Americans every one in over 20,000. (Id. at 459).

On cross-examination, Ms. Cross explained that the partial DNA profile from the rifle contained only five of the sixteen areas that are present in a full profile. (N.T. 6/3-6/7/2013 at 461). She testified that if any of the missing eleven areas did not match the victim, she would have to exclude the victim as being the source of that DNA. (Id. at 462).

Trooper Todd Neumyer, an expert in firearms and tool marks, was given three items to analyze. (N.T. 6/3-6/7/2013 at 393, 395). The first item was an envelope that contained one copper coated lead bullet and three mutilated bullet fragments. (Id. at 395). The second item was a box containing multiple items, including a Mossberg Bolt Action Rifle and bullets from two test fires. (Id. at 395-96). Trooper Neumyer noted that the rifle had been altered. (Id. at 396). Specifically, the barrel had been

8

shortened and the trigger guard had been removed. (Id.). The last item submitted to Trooper Neumyer was a sealed envelope containing a Winchester brand cartridge case. (Id.).

Trooper Neumyer conducted numerous tests on the rifle to ensure that it was capable of firing and to see if the rifle could be discharged any other way than pulling the trigger. (N.T. 6/3-6/7/2013 at 405-07). He testified that the rifle was capable of firing and that the only way the rifle could be discharged was to apply 3.6 pounds of pressure to the trigger. (Id.). However, because the trigger guard had been removed, Trooper Neumyer did explain that this exposes the trigger to impact or movement that could result in an unintentional discharge. (Id. at 407).

With respect to the bullet fragments, Trooper Neumyer testified that aside from concluding they were copper coated and made of lead, they were of no evidentiary value because they contained no markings. (N.T. 6/3-6/7/2013 at 408). Next, Trooper Neumyer analyzed the bullet. (Id. at 408-09). He determined that it was a .22 caliber bullet made of lead and coated in a thin layer of copper. (Id. at 409). Trooper Neumyer explained that each firearm has unique markings in the barrel and as the bullet travels through the barrel, those markings will be impressed upon the discharged bullet. (Id.). In this case, the bullet recovered from the victim's autopsy did not have many unique characteristics because of the path it traveled. (Id. at 410). Thus, Trooper Neumyer could not definitively state that the Mossberg rifle recovered was the only rifle that fired this bullet. (Id.). However, he was able to determine that the bullet was fired from the same make and model of the rifle recovered. (Id. at 411-12). The same analysis and determination was made with respect to the Winchester cartridge case. (Id. at 415-16).

On cross-examination, defense counsel for both the Appellant and co-defendant reiterated that Trooper Neumyer could not definitively state that the bullet

9

and cartridge case came from the rifle recovered. (N.T. 6/3-6/7/2013 at 417-16). Defense counsel also asked Trooper Neumyer about the lack of a trigger guard and the possible implications that could have on discharge. (Id. at 417). The trooper testified that anything, including a piece of clothing that applied 3.6 pounds of pressure to the trigger could cause the rifle to discharge. (Id. at 417-18).

The Mossberg rifle discussed above was not found at the scene of the homicide. The rifle was obtained during a separate, but related crime that took place on May 31, 2012.[8] The events of that day are as follows:

Pennsylvania State Trooper Christopher Keppel, a member of the Vice and Narcotics Unit, received a phone call from one of his confidential informants, Jaycott Rivera. (N.T. 6/3-6/7/2013 at 349-51). Trooper Keppel first met Jaycott during a raid of his family home in 2010. (Id. at 351). In that raid, Jaycott's mother, father, and wife were arrested on federal drug charges. (Id.). There was no evidence indicating Jaycott had any involvement with the drug ring, so he was not charged. (Id.). In an effort to help out his family members, Jaycott agreed to become a confidential informant. (Id. at 352-53).

On May 31, 2012, around lunchtime, Trooper Keppel testified that he received a phone call from a member of Jaycott's family. (N.T. 6/3-6/7/2013 at 353). Based on the nature of the information, Trooper Keppel immediately called Detective Jeff Spence with the York City Police Department. (Id. at 354). From that point forward, Trooper Keppel acted as the liaison between Jaycott and the York City Police. (Id. at 354-55).

Jaycott Rivera testified to explain the events leading up to him contacting Trooper Keppel. After verifying that he was a confidential informant and that his

---

[8] The following recitation of facts all relate to case 7000-2012. Because both the homicide and the conspiracy cases were so closely related, the District Attorney felt it was necessary to try the cases together.

motivation was to help out his family, Jaycott indicated that he knew both the Appellant and the co-defendant from a small social group. (N.T. 6/3-6/7/2013 at 240-42). On the morning of May 31, 2012, Jaycott was home with his wife when he received a phone call from the co-defendant. (Id. at 244-45). During that phone call, the co-defendant told Jaycott that they needed to go on a mission, but that he could not talk about it over the phone. (Id. at 245). Approximately twenty to thirty minutes later, the co-defendant, along with the Appellant, arrived at Jaycott's house. (Id. at 246).

According to Jaycott, the co-defendant and the Appellant asked if he had heard about the murder on Memorial Day. (N.T. 6/3-6/7/2013 at 247). Jaycott said he had not heard about it, and it was at that point that the co-defendant, while laughing, pointed to the Appellant and stated that he (the Appellant) pulled the trigger. (Id.). The Appellant further stated that he wanted the victim's vehicle, and when the victim refused to give up his keys, the Appellant shot him. (Id.). The two men told Jaycott that they needed to go on a mission because they needed money to get out of town. (Id. at 248). The initial plan was to go to Harrisburg, but Jaycot testified that he did not feel safe traveling with the two men, so he suggested they rob an individual nicknamed the Movie Man in York. (Id. at 248-49). The men agreed to stay in York. (Id. at 249). Jaycott testified that he picked the Movie Man because he knew that he was not going to be home that day. (Id.).

After deciding to stay in York and that the target would be the Movie Man, Jaycott, along with the Appellant and co-defendant went to the Movie Man's house to "check it out." (N.T. 6/3-6/7/2013 at 250-51). Before getting to the house, the three decided to stop in the park to further discuss their plan. (Id. at 251). After discussing the plan and casing the Movie Man's house, the three returned to the park. (Id. at 252). Jaycott testified that a man named Wesley brought them ski masks for the

11

"invasion" and that at the co-defendant's request Jaycott hid the masks in the woods. (Id.). After hiding the masks, the three men went back to Jaycott's house and hung out on his front porch. (Id. at 254). When Jaycott went inside to use the bathroom, he overheard the Appellant and co-defendant talking. (Id. at 254-55). According to Jaycott, he heard the Appellant say "we're going to kill this black bitch," referring to the Movie Man. (Id. at 255-56).

Upon hearing that statement, Jaycott asked his wife to call Trooper Keppel and tell him about the murder that happened on May 28th and the plan to rob the Movie Man later that day.[9] (N.T. 6/3-6/7/2013 at 256). Jaycott did speak to Trooper Keppel himself, but only briefly. (Id. at 257). When Jaycott went back outside, the co-defendant stated that there were a lot of cops passing by and that he wanted to do the robbery now, rather than later that evening. (Id.). The three men decided to head back to the park to collect their thoughts and finalize the robbery plan. (Id. at 257-58). Before leaving, Jaycott told his wife to keep calling Trooper Keppel to inform him of their location and plan. (Id. at 258). On the way to the park, the co-defendant indicated that he was waiting for a book bag. (Id. at 258-59). Jaycott testified that he knew a rifle was in the bag and that it was the same rifle used in the murder on May 28th. (Id. at 259). They went to the park, Jaycott got the ski masks out of the woods, and the three of them began finalizing their plans. (Id. at 260).

Under the guise of calling about his son, Jaycott had been calling his wife updating her on the plan to rob the Movie Man, so she could in turn update Trooper Keppel. (N.T. 6/3-6/7/2013 at 261). Jaycott testified that the ultimate plan was to go into the Movie Man's house, tie him up, and take anything that looked like it was valuable. (Id. at 262).

_____

[9] Throughout his testimony, Jaycott Rivera refers to Trooper Chris Keppel as "Detective Chris." For the purposes of this opinion, we will use Trooper Keppel's formal title.

On cross-examination, defense counsel focused on Jaycott's prior inconsistent statements. Jaycott testified that he remembered speaking to police on May 31st and June 8th, and he also remembered testifying at a preliminary hearing on September 21st. (N.T. 6/3-6/7/2013 at 266-67). In his previous statements, Jaycott told police that he contacted Trooper Keppel before the Appellant and co-defendant arrived at his house. (Id. at 267-68). Defense counsel for the Appellant pressed Jaycott on the details of his story; specifically, a prior statement that did not mention Harrisburg, a prior statement that mentioned a drug kingpin in Harrisburg, and whether there were other individuals involved in the plan. (Id. at 271-75). Lastly, defense counsel focused on Jaycott's desire to help his family. (Id. at 279-80). In order to get his family a reduced sentence, Jaycott admitted to setting the Appellant and co-defendant up. (Id. at 287).

On redirect, Jaycott testified that he had no prior knowledge of the mission, and that the initial idea to rob someone was the co-defendant's idea. (N.T. 6/3-6/7/2013 at 303). Jaycott clarified that his idea to stay in York and rob the Movie Man was the setup; not the entire premise to rob someone. (Id. at 304-05).

As previously mentioned, Trooper Keppel was the liaison between Jaycott and the York City Police. (N.T. 6/3-6/7/2013 at 355-56). Trooper Keppel eventually met up with Detectives Spence and Baez of the York City Police to help coordinate the plan to arrest the parties involved. (Id. at 355). After the twenty or so officers received a briefing on the situation, a surveillance team was setup to watch Jaycott's home on George Street and Bantz Park, where the suspects continued to meet up and discuss their plans. (Id. at 357). The goal was to intercept the suspects before they committed any crime. (Id.).

Officer Clayton Glatfelter, a member of the surveillance team, testified that he saw three people matching the descriptions of the informant, Appellant, and co-

13

defendant sitting at a picnic table in the park. (N.T. 6/3-6/7/2013 at 372). He observed one of the suspects get up from the table and get a bag out of the woods. (Id. at 373). Officer Glatfelter informed the other members of the surveillance team of what he saw, and the decision was made to go take the suspects into custody. (Id.).

Detective Jeff Spence was the one who gave the order to enter the park and arrest the suspects. (N.T. 6/3-6/7/2013 at 431-32). He testified that he was informed by Trooper Keppel that more suspects might be arriving, but he felt that the public safety outweighed the apprehension of more suspects. (Id. at 432-33). Two of the three suspects were apprehended without incident: Jaycott Rivera and the Appellant. (Id. at 433). The co-defendant ran and officers were forced to bring in a K9 unit to track him down. (Id. at 382-87, 433). Eventually, the co-defendant was found a few hours later hiding in the brush. (Id. at 387).

Detective Mayer was recalled to testify about the pieces of evidence found when the suspects were arrested. (N.T. 6-/3-6/7/2013 at 470). He said that a white plastic bag and a purple backpack were recovered during the arrest. (Id.). Detective Mayer said the backpack contained a casing, loose ammunition,[10] and a sawed off shotgun. (Id.). The plastic bag contained three ski masks. (Id.). On cross-examination, Detective Mayer stated that he was not aware of anyone who attempted to take fingerprints off the plastic bag, backpack, or evidence found therein. (Id. at 477). As noted in previous pages of this opinion, these pieces of evidence were sent to Trooper Neumyer for ballistics testing and Katherine Cross for DNA testing.

The last witness for the Commonwealth was Detective Andy Baez of the York City Police Department. Detective Baez was the lead detective in the homicide investigation that occurred on May 28th and assisted in the surveillance and arrest that

---

[10] Approximately 441 rounds of ammunition were found in the backpack. N.T. 6/3-6/7/2013 at 473-74.

14

occurred on May 31st. (N.T. 6/3-6/7/2013 at 487, 488-89). Detective Baez, along with Detective Spence, interviewed both the Appellant and the co-defendant on May 31st. (Id. at 498-99). Both were given their Miranda warnings and both waived them. (Id. at 499).

The Appellant's interview was both video and audio recorded, and it was later transcribed. (N.T. 6/3-6/7/2013 at 500). Although the Appellant could speak and understand English, he was more comfortable hearing the questions in Spanish and answering in Spanish. (Id. at 501). Thus, Detective Baez, along with participating in the interview, translated for the Appellant. (Id.). The Appellant told detectives that the victim[11] stole his stereo a couple days before the murder, and that really upset the Appellant because that stereo was a gift from his father who is now deceased. (Id. at 508-09). The Appellant's exact words were "I got furious and went crazy . . . and what happened, is what happened." (Id. at 509).

Looking for more information, detectives asked the Appellant where he first saw the victim. (N.T. 6/3-6/7/2013 at 509-10). The Appellant indicated that he saw the victim driving on the street and the victim said a bad word to him. (Id. at 510). The Appellant said he started running after the victim, who was in his truck. (Id.). Eventually, the Appellant and victim were outside of the victim's home, and, according to the Appellant, that is when the victim tried assaulting him. (Id.). When asked what he did, the Appellant stated, "I responded." (Id.). Detective Spence asked the Appellant if he meant that he responded with the rifle that was recovered and the Appellant stated yes. (Id.).

After hearing the general story from the Appellant, detectives went back and asked for more specifics. According to the Appellant, he knew it was the victim that

---

[11] Throughout the interview, detectives and the Appellant refer to the victim as "the Mexican." For our purposes we will refer to him as the victim.

15

had stolen his stereo because his neighbors told him. (N.T. 6/3-6/7/2013 at 512). When asked if he tried to take the victim's truck, the Appellant denied that he attempted to do so. (Id. at 520). The Appellant maintained that the entire encounter occurred because the victim stole his stereo, yelled a bad word at him, and then, when confronted about the stereo, attempted to assault him. (Id. at 516-17). Lastly, the detectives asked if the Appellant cared that he killed the victim. (Id. at 521-22). The Appellant responded by saying it was in "self-defense because he went into my house first." (Id. at 522).

Detectives did ask the Appellant about the plan to rob the Movie Man, but the Appellant indicated he did not want to talk about that. (N.T. 6/3-6/7/2013 at 529). The Appellant did state that he was not part of any plan, and that he was in the park only to say "hi" to some friends. (Id. at 525-26). That was the end of the Appellant's statement.

Detectives also took a statement from the co-defendant. The co-defendant denied being present at the murder on May 28th, and denied that the backpack he was carrying on May 31st was his or that he knew what was in it. (N.T. 6/3-6/7/2013 at 543-44). The co-defendant's story changed once he was told police had watched him on the evening of May 31st, but his general story was that he was on his way to see his mom when he decided to meet up with some friends. (Id. at 545). Eventually, the co-defendant said that although he was not present at the homicide, he knew the person who shot the victim, and that person was the Appellant. (Id. at 550-52). The co-defendant did not mention a stolen stereo, but he did state that the motive was to get some money so they could eat. (Id. at 552).

On cross-examination, defense counsel focused on the police investigation itself. Detective Baez testified that after Jaycott's second statement, on June 8th, no other substantial investigation took place. (N.T. 6/3-6/7/2013 at 568). They did not

16

check cell phone records to verify times that phone calls were made, or to determine the location of the suspects. (Id. at 568-69). Lastly, Detective Baez did testify that police did attempt to identify the other individuals allegedly involved in the May 31st incident, but those attempts were futile. (Id. at 570).

The Commonwealth rested, and both defense counsel for the Appellant and the co-defendant decided not to present any witnesses. (N.T. 6/3-6/7/2013 at 601, 607). With respect to the Appellant, the jury found as follows: guilty of first degree murder; guilty of robbery; guilty of criminal conspiracy to commit robbery; not guilty of criminal conspiracy to commit murder of the first degree; guilty of criminal conspiracy to commit robbery; and guilty of criminal conspiracy to commit burglary. (Id. at 765-766). On July 31, 2013, the Appellant was sentenced as follows: In case 6999-2012, Count 4, murder in the first degree, a mandatory sentence of life imprisonment. (N.T. 7/31/2013 at 4). Because of the mandatory life sentence, the Court did not issue separate sentences for the robbery and conspiracy to commit robbery. (Id.). In case 7000-2012, Count 2, conspiracy to commit robbery, 4 to 8 years to run consecutively to that in case 6999-2012. As defense counsel noted, Counts 2 and 3 in case 7000-2012 would merge, and therefore the Appellant was sentenced on one inchoate crime. (Id. at 3).

The Appellant filed a Post-Sentence Motion on August 9, 2013, which this Court denied on August 28, 2013. On September 27, 2013, the Appellant filed a timely Notice of Appeal. The trial Court directed the Appellant to file a Concise Statement of the Matters Complained on October 2, 2013. Because the Appellant failed to file his 1925(b) Statement, the 1925(a) Opinion was issued on December 4, 2013. The Superior Court remanded for the filing of a 1925(b) Statement nunc pro tunc, which the Appellant filed on July 23, 2014.

17

As previously mentioned, a miscommunication in the reassignment of this case to the undersigned judge resulted in a delay in preparing our 1925(a) Opinion. After receiving notification from the Superior Court in October of 2014, we immediately began drafting our opinion.

**Issues:**

I.      Did the trial court improperly find there was sufficient evidence to support the conviction for first degree murder?

II.     Was the verdict on the remaining counts against the weight of the evidence?

**Discussion:**

*Sufficiency of the Evidence: First Degree Murder*

As a preliminary matter, it should be noted that "when challenging the sufficiency of the evidence on appeal, the "[a]ppellant's [court ordered Pa. R.A.P. 1925(b) concise] statement must specify the element or elements upon which the evidence was insufficient in order to preserve the issue for appeal." *Commonwealth v. Gibbs*, 981 A.2d 274, 281 (Pa. Super. Ct. 2009). If the appellant fails to conform to the specificity requirement, the claim is waived. Id. In the present case, the Appellant's 1925(b) Statement states "[w]hether the trial court improperly found there was sufficient evidence to support the conviction for first degree murder." 7/23/2014, at ¶ 3a. Although the Appellant did list the specific crime, he did not specify the element or elements that he claims were not supported by sufficient evidence. However, we recognize that whether this statement is specific enough is up for debate; therefore, we will analyze the argument.

18

The standard of review for an appellate court reviewing a sufficiency of the evidence claim is well settled:

'The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.'

*Commonwealth v. Charlton*, 902 A.2d 554, 563 (Pa. Super. Ct. 2006) (quoting *Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa. Super. Ct. 2001).

The Appellant was convicted of first degree murder, which is defined as: "(a) **Murder of the first degree.**--A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa. C.S.A. § 2502(a). The Commonwealth must prove "that a human being was unlawfully killed; the defendant perpetrated the killing; and the defendant acted with malice and a specific intent to kill." *Commonwealth v. Patterson*, 91 A.3d 55, 66 (Pa. 2014). The requirement that the defendant have the specific intent to kill can be "inferred by the use of a deadly weapon upon a vital organ of the body." Id.

19

Although the evidence against the Appellant was not concrete, it was more than enough to establish every element beyond a reasonable doubt. First, the Commonwealth established that the victim, a human being, did in fact die. Second, the Commonwealth did establish that it was the Appellant who caused the killing. Aside from the Appellant's confession, the Commonwealth presented testimony from Jaycott Rivera, the confidential informant. Jaycott testified that the Appellant admitted killing the victim. (N.T. 6/3-6/7/2013 at 247). Detective Baez gave a summary of the co-defendant's statement, which implied that it was the Appellant who pulled the trigger. (Id. at 550-52).

Lastly, the Commonwealth established that the Appellant acted with malice and the specific intent to kill. Dr. Samuel Land, an expert in forensic pathology, testified that the victim's death was caused by a gunshot wound to the back. (N.T. 6/3-6/7/2013 at 338). He testified that the gun was pressed against the victim's skin when it was discharged because there was soot present around the entry wound. (Id. at 339-41). After performing the autopsy on the victim, Dr. Land was able to determine the path of the bullet. (Id. at 339). The bullet traveled through the victim's lower back, ribs, diaphragm, liver, adrenal gland, stomach, pancreas, aorta, and superior mesenteric artery. (Id.). This caused major bleeding in the victim's chest cavity and abdomen. (Id.). Along with the gunshot wound, Dr. Land noted that the victim had a fresh skin tear on his face. (Id. at 345). Dr. Land opined that based on the severity of the victim's wounds, it would have taken seconds to minutes for the victim to die. (Id.). Thus, the Appellant used a deadly weapon on a vital part of the body, and the specific intent to kill can be inferred.

Therefore, the Commonwealth presented sufficient evidence for a reasonable jury to find that the Appellant was guilty of first degree murder.

*Weight of the Evidence: Remaining Counts*

The Appellant argues that the guilty verdicts on the remaining counts were against the weight of the evidence. An appellate court reviewing a weight of the evidence claim uses the following standard of review:

> 'The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.'

*Commonwealth v. Charlton*, 902 A.2d 554, 561 (Pa. Super. Ct. 2006) (quoting *Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003)).

With respect to the May 28th incident, case 6999-2012, the Appellant argues that the guilty verdict on Count 2 robbery and Count 3 conspiracy to commit robbery were against the weight of the evidence. "A person is guilty of robbery if, in the course of committing a theft, he inflicts serious bodily injury upon another." 18 Pa. C.S.A. § 3701(a)(1)(i). The phrase "in the course of committing a theft" includes an attempt to commit a theft. 18 Pa. C.S.A. § 3701(a)(2); *see also Commonwealth v. Ennis*, 574 A.2d 1116, 1119 (Pa. Super. Ct. 1990). To constitute an attempted theft, the actor must, with the intent to commit a theft, take a substantial step towards completion. *Commonwealth v. Ennis*, 574 A.2d at 119. Criminal conspiracy is defined as:

> A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he: (1) agrees with such other person or persons that they or

21

one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime.

18 Pa. C.S.A. § 903(a)(1).

Although the Appellant denied that that his intent was to take the victim's truck, the Commonwealth presented evidence that, if believed, established the motive for approaching the victim was to steal his vehicle. In the co-defendant's statement to police, he indicated that the "other person"[12] needed to get some money so they could eat. (N.T. 6/3-6/7/2013 at 552). At least one witness testified that when he saw the two men approaching the victim it looked like they were going to rob him. (Id. at 182-83). Thus, a reasonable jury could find that the Appellant was guilty of robbery because he had the intent to commit a theft, took a substantial step towards committing that theft, and in the process inflicted serious bodily injury. Also, the jury could have decided that the Appellant entered into an agreement with another person to commit that robbery. Therefore, the jury's verdict was not against the weight of the evidence.

With respect to the May 31st incident, case 7000-2012, the Appellant argues that the guilty verdict on Count 2 conspiracy to commit robbery and Count 3 conspiracy to commit burglary were against the weight of the evidence. For both counts, the same elements of conspiracy apply. With respect to Count 2, the Commonwealth alleged that the Appellant entered into an agreement, whereby he threatened to immediately commit a robbery. 18 Pa. C.S.A. § 3701(a)(1)(iii). Regarding Count 3, the Commonwealth alleged that the Appellant entered into an agreement to, with the intent to commit a crime therein, enter a building. 18 Pa. C.S.A. § 3502(a).

---

[12] In the original transcript the co-defendant said the Appellant's name, but for purposes of trial, all references to the Appellant were changed to the "other person."

22

A reasonable jury could have found the testimony of Jaycott Rivera, the confidential informant, credible. Jaycott freely admitted that he became a confidential informant for the sole purpose of getting his family lower jail time. (N.T. 6/3-6/7/2013 at 242). A jury could have determined that his refusal to hide his motives increased his credibility. Jaycott's testimony is thoroughly explained above, and if the jury believed his testimony the Appellant did conspire to commit both robbery and burglary. Therefore, the jury's verdict was not against the weight of the evidence. It does not shock our sense of justice.

**Conclusion:**

Although the evidence against the Appellant was not concrete, the evidence presented by the Commonwealth in both cases was more than enough to find the Appellant guilty. The Commonwealth presented sufficient evidence to find the Appellant guilty of first degree murder. Also, the jury's verdicts on the remaining counts of robbery, conspiracy to commit robbery,[13] and conspiracy to commit burglary were not against the weight of the evidence. Therefore, we respectfully suggest that the arguments advanced by the Appellant are without merit.

By the Court:

Date: October 30, 2014

Richard K. Renn, Judge

---

[13] One count in 6999-2012 and another count in 7000-2012.

23