2026 PA Super 77

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES RESON | : | |
| | : | |
| Appellant | : | No. 1331 EDA 2025 |

Appeal from the Judgment of Sentence Entered January 24, 2025
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0006927-2022

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES RESON | : | |
| | : | |
| Appellant | : | No. 1332 EDA 2025 |

Appeal from the Judgment of Sentence Entered January 24, 2025
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0006828-2022


BEFORE: PANELLA, P.J.E., KING, J., and FORD ELLIOTT, P.J.E.[*]

OPINION BY PANELLA, P.J.E.:            **FILED APRIL 21, 2026**

_____

[*] Retired Senior Judge assigned to the Superior Court.

James Reson appeals from the judgments of sentence entered in the Philadelphia County Court of Common Pleas on January 24, 2025 under the above two dockets.[1] After careful review, we affirm.

The trial court summarized the factual history of these cases as follows:

On June 14, 2021, [] Reson [] was observed standing in the middle of traffic talking to himself at the 5100 block of West Girard Avenue in the City and County of Philadelphia as vehicles swerved to avoid him. He then approached a complete stranger, Brian Nelson (hereinafter "victim"), drew a firearm and shot into the victim's temple. The bullet passed through the victim's head, resulting in complete and permanent blindness. Surveillance footage from nearby cameras captured the incident, showing the victim crawling along the street, blood streaming from his face, as he felt his way in search of assistance. Bystanders had fled, leaving the victim unaided for several minutes. At trial, the jury observed the victim wearing dark sunglasses and being escorted to and from the witness stand by an aide, the victim also using a walking cane commonly used by individuals who are blind.

After shooting the victim, [Reson] made his way to a house where he had been squatting and engaged in an armed standoff with police. Multiple officers took defensive positions outside the residence and used a bullhorn to order [Reson] to surrender. When [Reson] eventually exited the house, he attempted to flee. At that point, from quite a distance away, Sergeant James Russell deployed a taser, incapacitating [Reson] and allowing officers to safely apprehend him. In accordance with police protocol for individuals who have been tased, officers transported [Reson] to the hospital. Subsequent body-worn camera footage captured him handcuffed to a hospital bed with blood on his hands. The jury viewed video footage documenting the entire sequence of events—from the shooting to [Reson]'s eventual apprehension and hospitalization.

_____

[1] Both cases were heard in a single trial and the jury entered the verdicts at the same time. This Court has consolidated the appeals *sua sponte*.

- 2 -

Trial Court Opinion, 8/14/25, at 1-2. The court expanded on the facts as follows:

On June 14, 2021, at approximately 8:00 p.m., the victim was present at a barbershop located on the 5100 block of West Girard Avenue in an attempt to retrieve a pair of eyeglasses he had inadvertently left behind during a prior visit for a haircut. As he exited, [Reson] approached, produced a firearm, and shot the victim in the head at close range. When the victim collapsed, [Reson] fired again before taking a wallet and three hundred dollars from the victim. Although the victim survived the shooting, he was left permanently blinded. Surveillance cameras at the A&M Food Market and the Philadelphia Police Department's "real-time crime camera" recorded the incident in full.

Shortly thereafter, [Reson] walked toward 51st Street. Police were dispatched and, upon arrival, Officer Paul Watson immediately transported the victim to the hospital. Officer Bently Woods and Officer Nabig Sakr, directed by bystanders to West Girard Avenue and 51st Street, observed [Reson] aiming a handgun at a group of men. Taking cover behind vehicles, Officers Woods and Sakr radioed for backup, prompting Officer Willie Robinson and Sergeant Russell to join them. [Reson] spotted the officers, advanced toward them while racking his firearm, and then moved onto the porch of 5113 West Girard Avenue. Appellant paced around the porch, yelling and aiming his gun at police before entering the house, at which point police lost sight of [Reson].

Several minutes later, [Reson] emerged from 5113 West Girard Avenue without the firearm and attempted to flee. Sergeant Russell deployed his taser, allowing officers to apprehend [Reson] without further incident. The court noted the exemplary level of professionalism and skill police demonstrated during this entire confrontation. Upon his arrest, [Reson] identified himself as "Razer Ramone" and was transported to the hospital pursuant to police department policy for individuals who have been tased. Because [Reson] refused to provide his actual name, Sergeant Russell attempted to identify him using a mobile fingerprint scanner but was unsuccessful due to the blood covering [Reson]'s hands. Police recovered various pieces of evidence, including video from the A&M Food Market surveillance camera depicting the shooting, a spent round, a fired cartridge casing (hereinafter "FCC")-both Fiocchi brand .22 LR caliber-and footage from the

"real-time crime camera" documenting [Reson]'s standoff with police.

Despite searching 5113 West Girard Avenue, police were unable to locate the firearm [Reson] had used in the shooting. However, they discovered multiple .22 LR fired cartridge casings (FCCs) on or about the front porch, in the backyard, and inside the residence, indicating that [Reson] had discharged the weapon throughout the house. The ammunition was later identified as Fiocchi brand .22 LR. Police also recovered live Fiocchi rounds and packaging in an upstairs bedroom.

*Id.* at 2-4 (footnote omitted).

On November 25, 2024, following a multi-day jury trial, the jury found Reson guilty of one count each of attempted murder, robbery, possession of a firearm prohibited, carrying a firearm without a concealed carry permit, carrying firearms in public in Philadelphia, and five counts of aggravated assault.[2] Sentencing was deferred for preparation of a presentence investigation report and a mental health evaluation.

On January 24, 2025, the trial court sentenced Reson to 14 to 28 years' incarceration for attempted murder, followed by consecutive terms of 6 to 12 months' incarceration for each count of aggravated assault against the officers, for an aggregate sentence of 16 to 32 years' incarceration. Reson filed a post-sentence motion, asserting the verdicts were against the weight of the evidence and that the sentence imposed was manifestly excessive. The

---

[2] 18 Pa.C.S.A. § 901(a), 18 Pa.C.S.A. § 3701(a)(1)(i), 18 Pa.C.S.A. § 6105(a)(1), 18 Pa.C.S.A. § 6106(a)(1), 18 Pa.C.S.A. § 6108, 18 Pa.C.S.A. § 2702(a)(1), and 18 Pa.C.S.A. § 2702(a)(6).

post-sentence motion was subsequently denied by operation of law. This timely appeal followed.

Reson raises the following issues in his statements of questions involved:

1. Was the verdict against the weight of the evidence?

2. Was the evidence sufficient to establish [Reson]'s guilt beyond a reasonable doubt for each offense?

3. Did the trial court err by not declaring a mistrial when the Commonwealth, contrary to the [c]ourt's explicit instructions, intentionally presented overwhelmingly prejudicial photographic evidence to the jury during closing arguments that had been previously ruled inadmissible?

Appellant's Brief, at 6 (suggested answers omitted).

Preliminarily, we note that while Reson's brief contains an argument section, it is not divided "into as many parts as there are questions to be argued." Pa.R.A.P. 2119(a). Reson purports to raise the above issues on appeal, but the argument portion of his brief only addresses one issue—pertaining to the court's denial of his motion for a mistrial during closing arguments. The issue statements pertaining to the sufficiency and weight of the evidence were abandoned in the argument section of the appellate brief. Accordingly, we find these issues waived for failure to develop them. **_See Commonwealth v. Tchirkow_**, 160 A.3d 798, 804 (Pa. Super. 2017) ("It is well-established that [w]hen issues are not properly raised and developed in briefs, when the briefs are wholly inadequate to present specific issues for

review, a court will not consider the merits thereof.") (citation omitted). We proceed to address the sole issue Reson preserved and developed on appeal.

Reson argues the trial court erred by not declaring a mistrial when the Commonwealth presented overwhelmingly prejudicial photographic evidence to the jury during closing arguments that had been previously ruled inadmissible. We find Reson's issue is without merit as he has misconstrued the trial court's evidentiary rulings.

We review a trial court's decision to deny a motion for a mistrial for an abuse of discretion. *See Commonwealth v. Wilson*, 273 A.3d 13, 21 (Pa. Super. 2022). A mistrial is an extreme remedy, and will be granted "only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Id.* (citation omitted). A mistrial is not warranted where cautionary instructions are adequate to overcome any prejudice to the defendant, and it is presumed that juries follow the instructions of a trial court to disregard inadmissible evidence. *See Commonwealth v. Simpson*, 754 A.2d 1264, 1272 (Pa. 2000).

Argument on this issue persisted throughout trial and was admittedly a bit convoluted. Accordingly, we have summarized the pertinent parts of the trial transcript for clarity.

In the middle of trial, the Commonwealth stated it was calling Lieutenant James Russell to the stand. Defense counsel requested a sidebar and indicated

that he did not see body-worn camera video for Lieutenant Russell in the digital discovery, and asked for the file to be sent to him so he could potentially argue a motion to suppress depending on the contents of the video. ***See*** N.T., Jury Trial, 11/21/24, at 62. The Commonwealth agreed to resend the video to defense counsel but noted for the record that the video had been sent as part of bulk evidence by a link sent to defense counsel on October 9, 2024, and resent at defense counsel's request on November 6, 2024. ***See id.*** at 64. After the Commonwealth played the portions of the video it intended to play for the witness, defense counsel objected and asked for an oral motion to suppress. ***See id.*** at 65. Defense counsel explained the grounds for suppression were that Reson did not appear to be properly Mirandized,[3] so any statements he made would not have been obtained by a waiver. ***See id.*** at 66.

The Commonwealth argued that the probative value of the video was the jury getting a good look at Reson on the night in question,

> in terms of what his face looked like, the clothing that he was wearing, is extremely probative of his identity of the shooter in the video that you just saw, and also the fact that he has red substance which is blood on his hands is extremely probative of whether or not he was the one that shot [the victim], and, then, was rummaging around in [the victim]'s clothing, in his person, as [the victim] was bleeding out from being shot. So, I understand counsel's concerned, but it is extremely probative, and, under the law, not unduly prejudicial to the point that it would require preclusion under 403.

_____

[3] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

*Id.* at 73. Defense counsel again noted his concern about whether or not Reson was given his *Miranda* rights as he is seen handcuffed to the bed. *See id.* at 74-75.

The Commonwealth then asked the court if the suppression issue had actually been waived, noting the video had been sent to defense counsel two months prior, in October and November of 2024. *See id.* at 78. Defense counsel argued he did not get the video. *See id.* However, defense counsel clarified he did not dispute a chain of custody would show the video had been dispatched to him. *See id.* at 79. The Commonwealth pulled up the audit trail on Evidence.com which showed the bulk evidence package had been sent to defense counsel on October 8, 2024 and was downloaded by defense counsel on October 10, 2024. *See id.* at 80-81. The Commonwealth argued a motion to suppress should not be allowed mid-trial where defense counsel had received the video but had simply not watched it. *See id.* at 83. The court agreed and noted defense counsel could instead make a trial objection that the prejudice outweighs the probative value. *See id.* at 83-84.

The court then directed that the Commonwealth's witness, Lieutenant Russell "can testify to what he saw … on the hands. He can testify that there was blood on his hands." *Id.* at 88. The court then indicated that no video was needed in addition to the Lieutenant's testimony. *See id.* at 89. The Commonwealth requested time to call a supervisor to discuss the issue of not showing the body-worn video, as it was a "big issue for my case." *Id.* at 89.

The Commonwealth noted it should not be penalized for defense counsel's failure to watch the video, despite receiving the video. *See id.* at 90. The Commonwealth additionally noted defense counsel had opened the door to discussion of the blood on Reson's hand during defense counsel's cross-examination of other officers that were part of the investigation. *See id.* at 90-91. The court took the matter under advisement, and recessed for lunch.

Upon returning, the court concluded the evidence had properly been made available to defense counsel, and therefore a motion to suppress was not allowed during trial. *See id.* at 99. The court directed that Lieutenant Russell could "testify that he saw blood on the hand, and, in fact, he had to wipe the blood off of the fingertips to get good fingerprints." *Id.* The court concluded that under Pa.R.E. 403, an image of the bloody hand was overly prejudicial, but that the Commonwealth could show a still photo from the body-worn video with the chain of the handcuff and the bloody hand redacted, in order to show the defendant in the hospital room "to show his clothing, his face, and show the jury that this is where we ended up, and that it was him, the same person that they arrested." *Id.* at 99-100. The court explained that it would give a curative instruction to the jury to disregard the redactions. Defense counsel indicated he had nothing else to present. *See id.* at 100.

On direct examination, Lieutenant Russell testified about his involvement with the investigation of this case. Pertinently, he testified Reson was tasered, placed in handcuffs, and transported to the hospital in a patrol

wagon. *See id.* at 123. Lieutenant Russell explained Reson was taken to the hospital because it is "[p]art of our policy is when we utilize a taser, that the individuals have to be treated by a physician." *Id.* at 123-24. Lieutenant Russell testified he went to the hospital to follow up with Reson. *See id.* at 124. The Commonwealth asked Lieutenant Russell if he remembered anything of note being on Reson's hands, to which Lieutenant Russell stated, "What I believed he had on his hand was blood." *Id.* at 127. Lieutenant Russell stated Reson had a red substance on his hands that looked like dried blood based on his 24 years of experience. *See id.* at 128. Lieutenant Russell noted he wiped some of the blood off Reson's thumbs. *See id.*

The Commonwealth then sought to show a still image from Lieutenant Russell's body-worn camera showing Reson at the hospital. *See id.* The court clarified that this was the photo that had previously been discussed. *See id.* at 128-29. The court proceeded to give a cautionary instruction to the jury regarding the redactions in the form of boxes crossing out certain sections of the photo, and explained that the jury could not make any negative inference based on the boxes and could not use the fact that there are boxes during deliberations. *See id.*.

The photo was then admitted into the record. *See id.* at 130. Lieutenant Russell affirmed the still image was from his body-worn camera when he saw Reson at the hospital. *See id.* Lieutenant Russell affirmed that the shirt Reson was wearing in the photo was the same shirt he was wearing when he was

arrested. *See id.* at 130-31. Defense counsel did not object at any point during the Commonwealth's direct examination of this issue.

On cross-examination, defense counsel reiterated Lieutenant Russell's testimony that he saw blood on Reson's hands. *See id.* at 139. Upon questioning, Lieutenant Russell clarified he did not know where the blood came from and did not know if the blood were Reson's blood or someone else's blood. *See id.* at 139-40.

During the Commonwealth's closing argument, the Commonwealth recalled Lieutenant Russell's testimony regarding Reson being taken to the hospital as follows:

> [] Reson is taken to the hospital due to being tasered. You heard testimony that whenever someone is tasered by a member of the Philadelphia Police Department, they are taken to the hospital to be medically cleared. Sometimes, the prongs have to be removed by medical staff. So, the cops who did not kill this man took him to the hospital, so he could get medical treatment, and while he is there, **[Lieutenant] Russell observes dried up blood on his hands**.

N.T., Jury Trial, 11/25/24, at 55 (emphasis added). Defense counsel immediately lodged an objection, after which a sidebar conversation was held outside the presence of the jury. *See id.* Defense counsel emphasized the court's evidentiary ruling that the blood on Reson's hands had to be redacted in the photo shown to the jury. *See id.* at 56. Defense counsel was emphatic that the Commonwealth had "put up the image, the redacted image, and [said] contemporaneously to that image that [] Reson had blood on his

hands." Defense counsel asserted the only remedy was a mistrial. *Id.* at 56-57.

The court indicated it was "stumped" and reiterated that it had said not to refer to the box, i.e. the redacted part of the photo, and stated that the Commonwealth had done just that. *Id.* at 57-58.

The Commonwealth expressed its confusion that it was not able to show the photograph, to which the court clarified that it was able to show the photograph. *See id.* at 58. The Commonwealth explained that it specifically said that Lieutenant Russell had testified that he saw blood on Reson's hands, and did not say anything about the boxes or what was under them. *See id.* While defense counsel continued to insist that a mistrial was the only remedy, the court expressed its belief that it could give a cautionary instruction instead. *See id.* at 59-61.

The Commonwealth again explained that it believed it had been in line with the court's evidentiary directives by specifically only stating what Lieutenant Russell had testified to, and showing the redacted photo that had already been entered into evidence. *See id.* at 61.

After taking the matter under advisement, the court did not find grounds for a mistrial, and instead decided to give a curative instruction to the jury. *See id.* at 62.

The Commonwealth agreed to the curative instruction, while insisting that it believed it was acting in line with the court's rulings. *See id.* at 65, 67.

The Commonwealth stated its intention to reference the photo again, but stated it would crop the photo to only show Reson's face, so the redacted portions would not even be visible. ***See id.*** at 65-66. The Commonwealth explained that the photo was already admitted into evidence and that it wanted the jury to be able to see Reson's face and his beard with the shirt he was wearing on the night in question. ***See id.*** at 66. The court ruled that the photo could not be used anymore in closing. ***See id.*** at 67. The court then gave a strong curative instruction to the jury. ***See id.*** at 68-69.

The record shows that the court clearly ruled that the Commonwealth could admit the redacted still photograph from Lieutenant Russell's body-worn camera into evidence. The record further shows that defense counsel did not object to the admission of this photo. Reson's current claim that the court "ultimately did exclude the photo, finding that it was overly prejudicial," Appellant's Brief, at 13, is belied by the record. ***See*** N.T., Jury Trial, 11/21/24, at 99-100 (court allowing a redacted photograph to be admitted "to show his clothing, his face, and show the jury that this is where we ended up, and that it was him, the same person that they arrested."); ***see also id.*** at 130 (redacted photograph admitted into the record after cautionary instruction was given to the jury, and without objection from defense counsel); ***see also*** N.T., Jury Trial, 11/25/24, at 55 (court agreeing that the Commonwealth was allowed to show the redacted photograph).

Based on the record, the Commonwealth was clearly permitted to, and did, admit the redacted photograph into evidence. Further, Lieutenant Russell was clearly permitted to testify that he personally observed blood on Reson's hands. Notably, contrary to Reson's assertions, the Commonwealth did not point out the redactions or state its own observation that there was blood on Reson's hands in the contested portion of the Commonwealth's closing. Instead, the Commonwealth referenced Lieutenant Russell's testimony that was already on record, that he observed blood on Reson's hands.

Reson appeared to be concerned that the Commonwealth referenced Lieutenant Russell's testimony at the same time that the photograph of Reson in the hospital was on display to the jury. We note that it is not clear from the trial transcript that the photo was on display during this portion of the Commonwealth's closing argument. In fact, the photo is not referenced at all prior to defense counsel's objection. **See contra, id.** at 54 (clearly indicating that a video was played for the jury that had been admitted into evidence).

Even if we assume the photo had been on display at that time, there was nothing preventing the Commonwealth from doing so. While the timing may not have been good practice, the fact remains that the court permitted the Commonwealth to both show the redacted photo and to have its witness testify that he saw blood on Reson's hands. The Commonwealth never referred to the redactions or what may be under them. The jury very well could have inferred that a bloody hand may have been under the redaction boxes based

- 14 -

on Lieutenant Russell's testimony; however, they never saw the blood on Reson's hands, nor the handcuffs on his hands, which was also redacted.

Here, the trial court denied Reson's motion for a mistrial after determining that an instruction to the jury would remedy any error. The court immediately provided the jury with a thorough cautionary instruction. Notably, Reson has not provided any argument regarding the propriety of the instruction itself. In the end, we are not persuaded the trial court abused its discretion in concluding its instruction remedied any prejudice from the Commonwealth's closing argument and therefore, that a mistrial was not warranted. We must state that upon our close review of the record, the Commonwealth acted in accordance and clear observance of the trial court's evidentiary rulings. Clearly, there were no grounds for a mistrial.

Because Reson's sole issue preserved on appeal does not merit relief, we affirm his judgments of sentence.

Judgments of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/21/2026